RECEIVED

MAY 2 3 2013

Legal Programs Department

SCANNED at LSP and Emailed
5/23/13  by  BM   116  pages
date       initials   No.

# APPENDIX - B

COURT OF APPEAL
STATE OF LOUISIANA
FIFTH CIRCUIT


DOCKET NUMBER: 08-KA-0468


STATE OF LOUISIANA
APPELLEE

VERSUS

GLENN C. AYO
APPELLANT


APPEALED FROM THE TWENTY-FOURTH JUDICIAL DISTRICT
COURT IN AND FOR THE PARISH OF JEFFERSON
STATE OF LOUISIANA
CRIMINAL DOCKET NO. 07-369
HONORABLE HENRY C. SULLIVAN, JR., PRESIDING


ORIGINAL BRIEF ON BEHALF OF APPELLANT


LOUISIANA APPELLATE PROJECT

MARGARET S. SOLLARS
BAR ROLL NO. 21122
ATTORNEY FOR APPELLANT
513 COUNTRY CLUB BLVD.
THIBODAUX, LOUISIANA 70301
(985) 446-2618

## TABLE OF CONTENTS

PAGE

CITATION OF AUTHORITIES .................................................. ii

STATEMENT OF JURISDICTION ............................................. 1

STATEMENT OF THE CASE/ACTION OF THE TRIAL COURT ......... 1-6

ASSIGNMENTS OF ERROR .................................................. 6-7

ISSUES PRESENTED FOR REVIEW ......................................... 7

LAW AND ARGUMENT ...................................................... 7-21

    Assignment of Error Number One ...................................7-15
    Assignment of Error Number Two .................................15-21

CONCLUSION ................................................................ 21

CERTIFICATE ................................................................ 21

EXHIBIT "A" - - MINUTES OF CONFINEMENT......................... 22

## CITATION OF AUTHORITIES

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

Article 5, Section 10 of the Louisiana Constitution of 1974 . . . . . . . . . . . . . . . . . . .1

La.C.Cr. Pro. art. 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

La.C.Cr. Pro. art. 213. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12, 13

La.C.Cr. Pro. art. 214. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

La.C.Cr. Pro. art. 215.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

La.C.Cr. Pro. art. 218.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

La.C.Cr. Pro. art. 770. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

La.C.Cr. Pro. art. 775. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

La.C.Cr. Pro. art. 912.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

La.C.E. art. 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

L.R.S. 14:64. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

L.R.S. 14:108. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States Constitution, Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## JURISPRUDENCE

Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1979). . . . .14-15

California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). . .13

Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) . . .9, 11

State v. Barber, 617 So.2d 974 (La.App. 4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . .20

State v. Brown, 395 So.2d 1301 (La. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Calloway, 97-796 (La.App. 5th Cir. 8/25/98), 718 So.2d 559. . . . . . . . . . . .9

State v. Collins, 378 So.2d 928 (La. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

State v. Dunbar, 356 So.2d 956 (La. 1978. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

State v. Fisher, 97-1133 (La. 9/9/97), 720 So.2d 1179. . . . . . . . . . . . . . . . . . . . . . .15

State v. Gaines, 340 So.2d 1294 (La. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18-19

State v. Jackson, 625 So.2d 146 (La. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17-18

State v. Jones, 94-1098 (La.App. 1st Cir. 6/23/95), 658 So.2d 307. . . . . . . . . . . . .10

State v. Prieur, 277 So.2d 126 (La. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17-18

State v. Longlois, 374 So.2d 1208 (La. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

State v. Ossey, 446 So.2d 280 (La. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

State v. Robertson, 97-2960 (LA. 10/20/98), 721 So.2d 1268. . . . . . . . . . . . . . . .14-15

State v. Ruffin, 448 So.2d 1274 (La. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

State v. Smith, 430 So.2d 31 (La. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 14

State v. Tomasetti, 381 So.2d 420 (La. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

State v. Thomas, 349 So2d 270 (La. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Tucker, 626 So.2d 707 (La. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

State v. Valentine, 570 So.2d 533 (La.App. 4th Cir. 1990). . . . . . . . . . . . . . . . . . . .10

State v. Van Buren, 615 So.2d 455 (La.App. 4th Cir. 1993) . . . . . . . . . . . . . . . . . . 10

State v. Vikesdale, 29,043 (La.App. 2ns Cir. 1/31/97), 688 So.2d 685. . . . . . . . . .13

State v. Woodberry, 95-2402 (La.App. 4th Cir. 12/27/96), 686 So.2d 984 . . . . . . . 10

State v. Walters, 582 So.2d 317 (La.App. 4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 10

Wong Sun v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). . . . . . . . . .15

iii

## STATEMENT OF JURISDICTION

This Honorable Court has jurisdiction over this matter pursuant to Article V, Section 10 of the Louisiana Constitution, and Article 912.1 of the Code of Criminal Procedure.

## STATEMENT OF THE CASE/ACTION OF THE TRIAL COURT

On January 9, 2007, a Bill of Information under Docket Number 07-369 was filed charging Glenn Ayo with the armed robbery of Baptiste DeBoy. This was a violation of L.R.S. 14:64.[1] (Record 23). Mr. Ayo pled "Not Guilty" at his arraignment on January 22, 2007.

Mr. Ayo filed several pre-trial motions and writs pro se before a suppression hearing was held August 16, 2007. Three people testified at that hearing and later at the trial—— Babtiste DeBoy, Deputy Paul Simoneaux, and Deputy George McCoy. Mr. DeBoy testified that he had gone with his wife to a Mardi Gras warehouse to distribute carnival throws. His wife had walked ahead of him when a man approached and put a knife to his throat. The robber demanded his wallet and money. Mr. DeBoy was knocked to the ground and thought he was going to be killed. (Record 80-81, 264-269).

The robber was wearing a blue hooded jacket. Mr. DeBoy gave him $28 and the robber left, walking toward the River Road. He then turned around and began walking toward Jefferson Highway. After he was able to get up, Mr. DeBoy went in the warehouse and reported the robbery. He described a white man about 5'7" and weighing 165 as being the robber. (Record 82-84, 269-272).

Soon after the police arrived, they got a call that someone had been found that

[1] A second appeal under Docket Number 08/KA/0469 was filed involving this case. In the second appeal Mr. Ayo was charged with resisting arrest, a violation of L.R.S. 14:108. Because this is a misdemeanor crime and an appeal was improperly granted, a motion to dismiss this appeal and allow Mr. Ayo to file a writ application was filed at the same time as this brief.

1

matched his description. He went with the officer, but did not identify the robber. They got a second call to go to a service station where another suspect was detained. He could not identify that man from a distance and asked to go closer. The man was bent over a patrol car. At that point he identified the man as the robber even though he was wearing a different colored shirt. Later the police found a bag of clothes and inside was a blue hooded jacket that he identified. (Record 85-88, 92-95, 276-280, 282).

On cross examination Mr. DeBoy admitted that he might have told the police that the robber weighed 150 pounds and was slim. He did not remember any tattoos on the robber's hands or any distinguishing features on his face. The knife that was found was similar to the one he had seen. Yet, he was not able to identify anyone in court that day or at the trial as being the robber. (Record 91, 94-96, 280-281, 285-286).

Officer Simoneaux responded to the 911 call. He began looking for someone who was walking and matched the robber's description. He found someone and Mr. DeBoy was called. When Mr. DeBoy stated that this was not the robber, he resumed his search. Detective Jewell reported another suspect getting into a cab. He found a cab stopped at a service station and walked up to Mr. Ayo who had a knife sticking out of his back pocket. He began to question Mr. Ayo and a struggle ensued. (Record 98-101, 235, 238).

After Mr. Ayo was handcuffed, he found a twenty dollar bill and a one. He knew Deputy McCoy had seen Mr. Ayo hand a five dollar bill to the cab driver. Soon afterwards Mr. DeBoy arrived and identified Mr. Ayo as the robber. (Record 101-102, 240-241). The initial description he had been given was a white male, clean shaven, 5'8", wearing a blue jacket. (Record 105, 235).

2

The arrest was made in Orleans Parish and not in conjunction with NOPD. He made the arrest after he crossed the parish line and claimed that it was a "citizen's arrest." (Record 107-108). Mr. DeBoy identified Mr. Ayo while he was still in the police car and 20 feet away. (Record 108-109). He added at the trial that Mr. Ayo was heavier than the day of his arrest, but otherwise he looked the same. Mr. Ayo also used an alias when he was booked. (Record 242-243, 253-254).

Deputy George McCoy took Mr. DeBoy's statement and transported him to identify the two suspects. Mr. DeBoy did not identify the first suspect, but shortly afterwards they went to look at Mr. Ayo. Mr. DeBoy asked to view Mr. Ayo up closer. At that time he identified Mr. Ayo as the robber. After the arrest, he spoke with the cab driver who pointed out a bag of clothing in the cab. A blue jacket was in the bag and it was identified by Mr. DeBoy. (Record 111, 114-118, 198-202).

In order to get the robber's description, he used a form to question Mr. DeBoy. Mr. DeBoy could not answer some of the questions and they were left blank. Mr. DeBoy was hesitant about identifying Mr. Ayo at first because he had on a green shirt rather than a blue jacket. (Record 121-122, 124, 204, 206-207). He also overheard Mr. Ayo claim that he was picked up by the taxi at Carrollton and Claiborne, not where Lieutenant Jewell saw him. He took a statement from cab driver and gathered the bag found in the taxi. (Record 207-209).

After the motion to suppress was denied and an objection noted, a second hearing was held on Mr. Ayo's motion re-urging the suppression issues. This motion was denied a second time. (Record 126-127, 145). A two day jury trial began November 27, 2008, with the stipulation that the 911 transcript of the call was authentic. (Record 152-153).

Testimony began with Lieutenant Daniel Jewell. He stated that he was home

3

when someone called him from his parents' warehouse. After he got a description of the robber, he began looking for him in his unmarked car. (Record 156-158). A Code 1 in which all traffic rules were to be followed was issued to look for a suspect. Lights and sirens were not used. (Record 160). While driving around he spotted someone who fit the description. He did not investigate him any further because a call came in that they had another suspect. When this turned out to be a bad stop, he resumed looking for the person he had seen. (Record 161-162).

After he returned to where he had seen that person, several bystanders said that the man had gotten into a blue cab headed toward New Orleans. A few minutes later he heard that a cab with a white passenger was at a gasoline station. He went to that location and saw the passenger resisting Deputy Simoneaux. (Record 165-166, 174). He was present when Mr. DeBoy identified Mr. Ayo. He also identified Mr. Ayo's booking photograph and attempted to explain away the booking discrepancies as simple mistakes. Mr. Ayo was listed as having blond hair and weighing 240 pounds. (Record 175, 178-179).

William Barrett was the driver of the cab. He had an arrangement with Mr. Ayo that he could be called on his cell phone and he would pick him up. He did not remember Mr. Ayo's arrest or the statement he gave the police. In that statement he identified the place where he picked up Mr. Ayo as being the same place where Mr. Ayo was seen by Lieutenant Jewell. He did not disagree that he picked up Mr. Ayo at Dave's house and he had trouble finding it. (Record 190-192, 194).

After Deputies McCoy, Simoneaux and Mr. DeBoy testified much as they did at the suppression hearing, the State ended its case with testimony from Susan Lee. She was a nurse at the jail and verified that the booking information stated that Mr. Ayo's weight was listed as 181 pounds. Mr. Ayo presently weighed 212 pounds.

4

(Record 303).

Mr. Ayo waived his right to remain silent and testified. (Record 311). He had spent the night with his girlfriend and was walking along Carrollton when his friend Theo Brickley picked him up. He rode to Dave's house on Cicero Street to pick up his laundry. He needed to get his work clothes because he was going to strip some wiring for the copper. He called for Mr. Barrett's cab while at Dave's house and he bought a bag of clothing from Dave because his laundry was not ready. Dave also gave him a kitchen knife to use for stripping the copper. (Record 313-316, 318, 358).

He caught the cab where Detective Jewell first saw him. He had no need for money because his mother had wired him $300 the day before his arrest.[2] He had also been beaten a week before when someone tried to rob him. At the time of his arrest he still had two black eyes which could be seen in his booking photograph. (Record 317, 319-321, 344).

When they arrived at the gas station, the driver went inside and he stepped out of the cab to make a phone call. At that time a policeman rushed him and grabbed the kitchen knife in his back pocket. The officer put him on the hood of his car when another unit arrived. He was cuffed and they started taking things out of his pockets. Mr. DeBoy arrived soon afterwards and said that he "sort of" looked like the robber. Mr. DeBoy was about 10 feet away before he made any identification. (Record 322-325, 356, 366).

After showing the tattoos on his hands, he explained that he had them for 30 years. He told the police he was coming from Carrollton but he never said he had been picked up there. He admitted that he had previously been convicted of manslaughter and since being in jail, he had lost weight. At the time of his arrest, he

---

[2] The receipt for this money was introduced into evidence. (Record 275, 324).

weighed 240 pounds. (Record 327-329).

When Mr. Ayo was questioned further about this conviction, counsel called for a mistrial that was denied. (Record 330-332). A second call for a mistrial was made when the State brought up Theo Brickley's convictions in spite of Mr. Brickley not being available to testify. (Record 335-338). The man he worked for was named Joe and he had only worked for him two weeks, earning ten dollars per hour. (Record 338, 340-341). He had written a letter to Mr. Barrett explaining that he had gotten the knife because of a dispute with a former contractor. He explained that he had two reasons for carrying the knife. He gave the police his brother's name because he knew that an attachment had been issued in Florida when he had missed court. (Record 346, 359-360).

The State had no rebuttal and closing arguments were given. While the Court found Mr. Ayo guilty of resisting arrest, the jury deliberated. They returned a verdict of guilty as charged. (Record 383-384). A motion for new trial was argued and denied on December 5, 2007. (Record 400). After Mr. Ayo waived his rights, he was sentenced to 87 years with the Department of Corrections. This was without benefit of probation, parole, or suspension of sentence, and with credit for time served. The State filed a multiple bill at that time, but it was withdrawn on February 28, 2008. (Record 402, 410). The written motion for appeal was granted December 17, 2007. (Record 68-69).

This matter is now before this Honorable Court. Mr. Ayo assigns two errors as the basis for reversal of his conviction and sentence.

## ASSIGNMENTS OF ERROR

I.     The Trial Court erred by failing to suppress the identification obtained in violation of the defendant's constitutional rights.

2.    A mistrial should have been granted.

## ISSUES PRESENTED FOR REVIEW

1.    Did the Trial Court err when the identification of Mr. Ayo was not

suppressed?

2.    Should a mistrial have been granted?

## LAW AND ARGUMENT

## ASSIGNMENT OF ERROR NUMBER ONE (1)

1. The Trial Court erred by failing to suppress the identification obtained in

violation of the defendant's constitutional rights.

The State, in its attempt to prove Mr. Ayo's guilt, asked the jury to disregard

the discrepancies and hesitancy in Mr. DeBoy's identification of Mr. Ayo as the

robber.  Furthermore, an illegal arrest occurred when the arrest and seizure was

effectuated outside Jefferson Parish and without a warrant.

### The Identification

Mr. DeBoy was an elderly man who certainly wanted to do what was right.

There is no doubt that he wanted to tell the truth and accuse the right person.

However, he had had two cataract surgeries and his eyesight had dimmed through the

years. (Record 263).  Originally he told Detective Jewell to look for a white man who

was nice looking, clean shaven, dark hair, about 5'9", and wearing a blue hooded

jacket. (Record 158).  Minutes later he gave more or less the same description to the

911 operator. (Record 105, 235).

Yet, when Deputy McCoy arrived, he described a white man about 5'7" and

weighing 165.  He might have even told the police that the robber weighed 150

pounds.  He did not remember any tattoos on the robber's hands, nor did he report

that the hair color was dark. (Record 91, 94-96, 269-272, 280-281, 285).

Most importantly, Mr. DeBoy was not able to identify Mr. Ayo at the suppression hearing or the trial. The only time he indicated that Mr. Ayo may have been the robber was the one-on-one identification at the gas station. Even then he was hesitant and he assumed that Mr. Ayo had been arrested as the suspect. (Record 92-96, 281, 285-286, 288-290, 255).

Also important were some distinguishing features that were inconsistent with Mr. DeBoy's description of the robber. Mr. Ayo had been beaten the week before and had black eyes and bruising as shown by his booking photograph. He was also older than Mr. DeBoy's description and weighed at least 50 pounds more than the assailant. He was not the nice, slim, clean cut, young man described by Mr. DeBoy. (Record 273-274, 283). Also, Mr. DeBoy could not identify the knife taken from Mr. Ayo even though it had a broken handle and was not big. (Record 159, 278, 316).

There were so many weight and age descriptions that it was impossible to determine what the robber actually looked like. Mr. DeBoy gave descriptions of 150 pounds, 165 pounds, 180 pounds, slim, no hair color (even though Deputy Simoneaux said he looked for someone with dark hair), age 35, age under 50, and no distinctive marks. (Record 82-84, 91, 183, 235, 238, 246, 215-216, 221). When this description is compared to what Mr. Ayo looked like (5'8", 240 pounds, black eyes and scabbing on face where he had been beaten the week before, age 44, tattoos on hands), the only conclusion is that Mr. DeBoy was mistaken in his identification, particularly when it was a one-on-one identification and Mr. Ayo was handcuffed and bent over a police car. (Record 178-179, 303, 327-329).

It was an uncanny set of circumstances that Mr. Ayo had a blue jacket and a knife in his pocket. In all probability it was the circumstances that caused Mr. DeBoy to identify Mr. Ayo rather than Mr. Ayo's physical characteristics. Surely,

8

considering the number of white men walking on a Sunday morning, albeit carrying a knife and a blue jacket, this evidence cannot be considered reliable, especially when Mr. DeBoy was never able to identify Mr. Ayo except for the one time he was handcuffed and in police custody.

Often eyewitness testimony concerning an identification is unreliable. Typically a jury should be aware that identification testimony must be weighed according to the opportunity of the witness to view the offender at the time of the offense, the witness's degree of attention and earlier description of the offender, the level of certainty shown by the witness when confronting the defendant, and the length of time between the offense and the identification confrontation. See, **Manson v. Brathwaite**, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

Mr. DeBoy's identification was hesitant and it should be viewed in light of the circumstances that someone other than the robber could have been walking along a street carrying a blue jacket and a knife. Mr. DeBoy could have been easily mistaken, particularly when he never gave a consistent description that fit Mr. Ayo. This, in conjunction with Mr. DeBoy knowing that a suspect had been arrested, makes the identification unreliable.

When the motion to suppress was denied, very little of this information was available to the Court. Mr. DeBoy was not able to identify Mr. Ayo a third time during the trial, nor was the confusion over Mr. Ayo's weight and age so evident. Moreover, as this Court is well aware, suppression issues are not limited to what is presented at the suppression hearing, but appellate courts may also consider pertinent evidence given at trial. Any corrupting influence showing a suggestive identification must be weighed against the factors supporting the reliability of the identification. See, **State v. Calloway**, 97-796 (La.App. 5th Cir. 8/25/98), 718 So.2d 559.

9

Much case law exists that when the key issue is the identity of the person who committed the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. See, **State v. Smith**, 430 So.2d 31 (La. 1983) and **State v. Jones**, 94-1098 (La.App. 1st Cir. 6/23/95), 658 So.2d 307, 311-313. Moreover, a one-on-one identification is not favored under the law because it is obviously suggestive and displays the defendant singularly. **State v. Dunbar**, 356 So.2d 956 (La. 1978). A witness identification should be suppressed if there existed an element of suggestiveness in the identification procedure, and if, under all the circumstances, the suggestive procedure gave rise to a substantial likelihood of misidentification. See, **State v. Van Buren**, 615 So.2d 455, 457 (La.App. 4th Cir. 1993).

Because of its potential for suggestiveness, a one-on-one, in-field, show-up of a handcuffed suspect is disfavored. **State v. Woodberry**, 95-2402 (La.App. 4th Cir. 12/27/96), 686 So. 2d 984, 988; **State v. VanBuren**, *supra*, at 457; **State v. Walters**, 582 So.2d 317, 321 (La.App. 4th Cir. 1991); and **State v. Valentine**, 570 So.2d 533, 537-38 (La.App. 4th Cir. 1990). Suggestiveness inheres in the police officer's presentation of the suspect under those conditions as the person making the identification assumes that the police did not pluck the suspect randomly off the street, but instead, had good reason to believe that the suspect in their custody was, in fact, the one who committed the crime. As a result, the potential for the victim unwittingly to "rewrite" in his memory the details of his encounter with his assailant during the commission of the crime is too great for the subsequent identification to be deemed reliable.

The identification procedure in this case was unquestionably suggestive. The only issue is whether there was a substantial likelihood of misidentification.

Considering the circumstances surrounding Mr. DeBoy's identification, all of the
**Braithwaite** factors do not favor admissibility in this case. The identification was
the crucial issue in this case, but, under these circumstances Mr. Ayo's identification
as the culprit was unreliable. As such, this conviction should be vacated on the basis
of this error.

### The Illegal Seizure and Arrest

No warrant was issued for Mr. Ayo's arrest. The only information that
Detective Jewell had about the robber was that he was looking for a nice looking,
clean shaven, white male of average height who was wearing a blue hooded jacket.
As such, he evidently began looking for any white male who was walking in the
surrounding neighborhood.

To illustrate the vagueness of this description and Mr. DeBoy's other
descriptions, Detective Jewell saw Mr. Ayo on foot several blocks from the robbery.
About the only thing that matched was that he was a white male.  Mr. Ayo was a
good deal heavier and older than the person Mr. DeBoy described. About the time
that Detective Jewell decided to stop Mr. Ayo, he heard that another person had been
detained. He had seen Mr. Ayo standing in the street talking to someone. (Record
182). He left Mr. Ayo alone and began going to where the other person was being
held. When Mr. DeBoy said that the person was not the robber, Detective Jewell
returned to where he had seen Mr. Ayo. He learned that he had gotten in a cab
headed for New Orleans.

Deputy Simoneaux started looking for the cab and he crossed the parish line.
He saw a cab stopped at gas station and Mr. Ayo standing next to the cab. He saw a
knife sticking out of a back pocket and Mr. Ayo was wearing a green shirt.  He
immediately approached Mr. Ayo and tried to take the knife away. By then other

11

officers, also from Jefferson Parish, arrived and they handcuffed Mr. Ayo. They removed items from his pockets and had him in custody when Mr. DeBoy arrived. (Record 258).

This was the extent of the reasonable cause used to seize and arrest Mr. Ayo. When confronted with the fact that the officers lacked the authority to make an arrest in another parish, it was explained that they had made a citizen's arrest as they were in "hot pursuit" of Mr. Ayo. Yet, sirens were not used and officers were instructed to follow all traffic laws. (Record 185, 195).

A citizen's arrest is authorized under Article 214 of the Code of Criminal Procedure. It allows a "private person" to make an arrest when the person arrested has committed a felony whether in or out of his presence. However, a citizen can only make an arrest when the person arrested actually commits a felony. See, **State v. Longlois**, 374 So.2d 1208 (La. 1979). Also pertinent is Article 213 which requires reasonable cause for a peace officer to make an arrest for a felony. A peace officer in close pursuit of a person to be arrested may enter another jurisdiction to make the arrest.

In this case there was no probable cause to arrest Mr. Ayo because he was certainly not free to leave after Deputy Simoneaux stopped him. As a result, any evidence obtained as a result of this arrest/detainment was tainted.

Louisiana Code of Criminal Procedure article 201 defines an arrest as the taking of a person into custody by another by the actual restraint of that person either by force or submission of the person arrested to the custody of the person making the arrest. Article 218.1 of the same code dictates that when any person is arrested or detained in connection with the investigation of a crime, that person shall be fully advised of the reason for the arrest or detention, his right to remain silent, his right

12

against self-incrimination, his right to assistance of counsel, and, if indigent, his right to court appointed counsel.

Under both the state and federal constitutions, a "seizure" occurs when the totality of the circumstances surrounding a citizen's encounter with the police indicates that a reasonable person would not feel free to decline the officers' requests or otherwise terminate the encounter. **State v. Vikesdal**, 29,043 (La.App. 2nd Cir. 1/31/97), 688 So.2d 685. In **California v. Hodari D.**, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court held that an individual is "seized" within the meaning of the Fourth Amendment when that individual either submits to the police show of authority or is physically contacted by the police. This standard for determining when a detention occurs or is imminent was adopted by the Louisiana Supreme Court in **State v. Tucker**, 626 So.2d 707 (La. 1993).

The police may not approach an individual under circumstances which indicate that some form of detention is imminent unless they have either probable cause for an arrest or reasonable suspicion for an investigatory stop. **State v. Ruffin**, 448 So.2d 1274 (La. 1984). Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, **some physical touching of the person of the citizen**, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. **California v. Hodari D.**, *supra*, (emphasis added). The removal of a person from one area to another has been deemed to be indicative of a detention as opposed to a consensual encounter. **State v. Ossey**, 446 So.2d 280 (La. 1984).

When an arrest is made without a warrant as dictated by La.C.Cr. Pro. art. 213(3), the arresting officer must have reasonable cause to believe that the person

arrested has committed a crime. This definition of reasonable cause is guided by the applicable principles rendered in **State v. Brown**, 395 So.2d 1301 (La. 1981); **State v. Collins**, 378 So.2d 928 (La. 1979), and **State v. Thomas**, 349 So.2d 270 (La. 1977). These decisions require probable cause for a warrantless arrest. Probable cause is defined as when the facts and circumstances indicate by reasonable and trustworthy information that it is more probable than not the person has committed an offense and those actions are not inconsistent with innocent activity, or where the possibility of criminal activity is no greater than the possibility of innocent behavior. Mere suspicion by the arresting officer is not enough.

To discourage police misconduct, evidence recovered as a result of an unconstitutional search or seizure has been held inadmissible. Evidence abandoned, disposed of or surrendered by a citizen and recovered by the police as a direct result of an unconstitutional seizure of that person, even an imminent detention, may not be used in the resulting prosecution. **State v. Tucker**, *supra*.

The belief that a person is armed provides the sole rationale for a frisk or pat down during an investigatory detention. C.Cr.P. Art. 215.1. Other searches are only justified following a custodial arrest. In order to effect even an investigatory detention the police officers must have a reasonable suspicion to believe the person has committed or is about to commit a crime. Reasonable suspicion for an investigatory detention is something less than probable cause and must be determined under the specific facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference.

Although reasonable suspicion is a less demanding standard than probable cause, "the content of information possessed by police and its degree of reliability"

remain the significant factors to be weighed in determining whether the detention of the person was reasonable under the circumstances. **Alabama v. White**, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) and **State v. Robertson**, 97-2960 (La. 10/20/98), 721 So.2d 1268.

This was an arrest without a warrant and more than an investigatory stop. Therefore, the State was required to prove the basis of probable cause for Mr. Ayo's arrest. It was clear that Mr. Ayo was not free to leave and when Deputy Simoneaux put his hands on Mr. Ayo, an arrest occurred. Under **Hodari D., Tucker**, and **Ossey**, an arrest was made before any other evidence was found. Key to an arrest is the concept of restraint of the liberty of the accused and it does not matter when the arresting words are uttered. **State v. Tomasetti**, 381 So.2d 420, 423 (La. 1980).

Mr. Ayo was placed under arrest before probable cause for any crime was established. Because this arrest was illegal, any evidence obtained as a result should have been suppressed. See, **Wong Sun v. U.S.**, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and **State v. Fisher**, 97-1133 (La. 9/9/97), 720 So.2d 1179.

Thus, the only possible conclusion is that Mr. Ayo's arrest was made without probable cause. As such, the evidence was illegally obtained and should have been suppressed.

## ASSIGNMENT OF ERROR NUMBER TWO (2)

2.    A mistrial should have been granted.

Two times defense counsel called for a mistrial. The first time the prosecutor overstepped her role was when she accused Mr. Ayo of being on parole for a manslaughter conviction from 1994. Mr. Ayo contradicted this statement and said he was no longer on parole. The prosecutor then went on to say that an attachment had been issued for him from Florida. At that point an objection was made with

counsel stating that Mr. Ayo was not on parole and there was no certified evidence

that an attachment had been issued. The Court told the prosecutor to move on, denied

the motion, and ordered that the question and response be stricken from the record.

(Record 330-333).

The second time a mistrial was called for was when the prosecutor brought up

Theo Brickley and asked Mr. Ayo if Mr. Brickley was going to testify. Mr. Ayo

responded that a subpoena was issued but Mr. Brickley was not served. Therefore,

he would not testify. Then the following exchange took place in front of the jury:

> Q. The clerk was unable to serve him. Y'all couldn't find him? Now,
> you do know that your good bud, Theo Brickley –
>> Mr. Schmidt:
>>> Objection, Your Honor.
>> Ms. Swaim:
>>> Just got guilty for like four felonies in Division "O."
>> Mr. Schmidt:
>>> Objection, Your Honor. May we approach?

A bench conference was held in which counsel objected because it was totally

inappropriate for this information to be conveyed to the jury when Mr. Brickley had

not been served and was unavailable to testify. Ms. Swaim replied that the jury had

a right to know that Mr. Brickley was on probation. Counsel countered that Ms.

Swaim was seeking to "tar and feather" Mr. Ayo because he got a ride with someone.

The Court ruled that Ms. Swaim did not have the right to go into Mr. Brickley's

criminal history, but that a mistrial would not be granted. It further refused to

admonish the jury and told the attorneys to move on. (Record 335-339).

### Other Crimes Evidence

When counsel first called for a mistrial, other crimes testimony was introduced

when nothing in the present charges even suggested that Mr. Ayo may have been

wanted in another jurisdiction. Certainly without certified court documents this

allegation was strictly "out of bounds" and was offered for no other reason than to

reinforce the image that Mr. Ayo was a dangerous man. The prosecutor purposefully

introduced this information for its for its prejudicial effect. Moreover, the admonition

to strike the question and response did not cure the harm done to Mr. Ayo.

This allegation had nothing to do with this case and a mistrial should have been

declared because (1) there was no element for which **Prieur** evidence was genuinely

at issue in the case, (2) no clear and convincing standard was used to test whether it

had any valid evidentiary value, and (3) the probative value of the evidence was

certainly outweighed by its prejudicial impact. Louisiana Code of Evidence article

404(B) provides:

> **Other crimes, wrongs, or acts.** (1) Except as provided in Article 412,
> evidence of other crimes, wrongs, or acts is not admissible to prove the
> character of a person in order to show that he acted in conformity therewith. It
> may, however, be admissible for other purposes, such as proof of motive,
> opportunity, intent, preparation, plan, knowledge, identity, absence of mistake
> or accident, provided that upon request by the accused, the prosecution in a
> criminal case shall provide reasonable notice in advance of trial, of the nature
> of any such evidence it intends to introduce at trial for such purposes, or when
> it relates to conduct that constitutes an integral part of the act or transaction
> that is the subject of the present proceeding.

Also, the official comments to Article 404(B) indicate that the codification was not

intended to change the prior jurisprudence under **Prieur**.

In order for other crimes evidence to be admissible under Article 404 (B)(1),

certain conditions must be met. In **State v. Jackson**, 625 So.2d 146 (La. 1993), the

Louisiana Supreme Court explained:

> In summation, for the evidence to be admissible, the state must comply
> with the notice requirements and limiting instructions set out in **Prieur**,
> prove with clear and convincing evidence that the other acts or crimes
> occurred and were committed by defendant, demonstrate that the other
> acts satisfy one of the requirements listed in La. Code Evid. art. 404
> (B)(1), and, finally, show that the probative value of the evidence
> outweighs its prejudicial effect.

**Id**. at 149. These **Prieur** requirements are the defendant's constitutional safeguards

against the introduction of irrelevant and prejudicial information.

17

In **State v. Prieur**, 277 So.2d 126 (La. 1973), the Louisiana Supreme Court

articulated the reason why the admission of other crimes evidence would be strictly

regulated and limited:

> The admissibility of other acts of misconduct involves substantial risk
> of grave prejudice to a defendant. As to the prejudicial effect of
> evidence of other crimes, Wigmore says:
>
> '* * * The natural and inevitable tendency of the tribunal--whether judge
> or jury--is to give excessive weight to the vicious record of crime thus
> exhibited, and either to allow it to bear too strongly on the present
> charge, or to take the proof of it as justifying a condemnation
> irrespective of guilt of the present charge. * * *'. I Wigmore, Evidence
> s 194 (3rd Ed.).

**Id.** at 128. The key principle of **Prieur** is that other crimes evidence is **inadmissable**

unless it falls within one of the limited exceptions and the State follows the proper

procedures. Admitting such evidence is not the rule, it is the exception.

The Louisiana Supreme Court in **State v. Jackson**, *supra*, stated:

> Generally, evidence of other acts of misconduct is not admissible;
> however, there are statutory and jurisprudential exceptions to this rule.
> One exception is when the evidence of other acts tends to prove a
> material issue and has independent relevance other than showing that the
> defendant is a man of bad character. Even if independently relevant, the
> probative value of such evidence must be weighed against its prejudicial
> effect. . . . Evidence of other acts is allowed to prove, 'motive,
> opportunity, intent, preparation, plan, knowledge, identity, absence of
> mistake or accident, or when it relates to conduct that constitutes an
> integral part of the act or transaction that is the subject of the present
> proceeding.' One of these factors must be at issue, have some
> independent relevance, or be an element of the crime charged in order
> for the evidence to be admissible.

**Id.** at 148-149. (*Citations omitted*). There are many factors which can create

improper prejudicial effect from allowing the admission of "bad act" evidence. In

**State v. Gaines**, 340 So.2d. 1294 (La. 1976), the Louisiana Supreme Court had

explained:

> The prejudice results from various factors, among which are: (1) the
> strong possibility that the jury will be unduly swayed in its
> determination of guilty merely because the defendant is a 'bad man,' (2)

18

the possibility that the evidence may confuse the jury in collateral issues and detract their attention from the main issue of the defendant's guilt **for the crime charged**. . .

Therefore accepting the argument that this evidence is highly relevant, the evidence is nonetheless excluded, not because it fails to tend to prove the defendant's guilt, but because it does it too well and thereby deprives the 'bad man' of the fair trial and benefit of the presumption of innocence and the State's burden of proof.

**Id.** at 1296. (*Emphasis added*).

This other crimes' evidence was not relevant to any genuine contested issue in this trial. It did not fall within any of the exceptions which allowed it introduction. Moreover, the probative value of these assertions was greatly outweighed by its prejudicial effect. The other crimes' evidence was so vague that Mr. Ayo could have been guilty of any crime and there was no "connexity" between the other crimes and the case on trial. As the prosecutor was aware, the jury was much more likely to use these allegations to convict Mr. Ayo than to let the facts of this case speak for itself. This made the prejudicial effect of the evidence outweigh its probative value.

The Prosecutor's Reference to Mr. Brickley's
Conviction When He Did Not Testify

The second time defense counsel asked for a mistrial was when the prosecutor referred to Mr. Brickley's convictions when Mr. Brickley was not even available to testify. If Mr. Brickley had been served and had testified, then his convictions would have been fair game. However, the references to these convictions were clearly designed to make Mr. Ayo guilty by association. No evidence was even presented that Mr. Ayo knew of the charges, much less any convictions. Yet the Court refused to even give an admonishment.

La.C.Cr.P. art. 775 provides in pertinent part that a mistrial may be ordered when there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible by law. "Upon motion of a defendant, a mistrial

19

shall be ordered ... when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 777." Furthermore, under Article 770(2) a prosecutor is not allowed to comment about another crime committed by the defendant as to which the evidence is not admissible. Thus, it stands to reason if the prosecutor cannot bring up inadmissible "other crimes" evidence relating to the defendant, then without exception the prosecutor may not question a defendant about alleged crimes committed by someone else when that person is not available to testify. This rule exists to protect a defendant from direct or indirect unfavorable inferences which might otherwise be drawn from an association with that person, and it is reinforced by the evidentiary rules concerning the reliability of hearsay. **State v. Barber**, 617 So.2d 974 (La. 1993).

        In this case there should be no question that the prosecutor deliberately focused the jury's attention, not once but twice, on its theory that Mr. Ayo was a man of criminal character who, as such, must be guilty of this crime. Because of the failure of Mr. DeBoy to make a consistent and positive identification, a weakness that the prosecutor was bound to acknowledge after his testimony, the prosecutor felt compelled to bring in clearly inadmissible assertions in order to buttress her case. She basically told the jury to convict Mr. Ayo on the basis of her unconfirmed, unsubstantiated, and clearly illegal allegations of unrelated, other criminal conduct. By emphasizing these points, the implication could not have been any clearer. The prosecutor was referring to alleged, unsubstantiated "other crimes" by the defendant and a possible witness. These were clearly illegal and cannot be considered harmless error, especially when each and the cumulative effect of both led to Mr. Ayo's conviction.

As such, a mistrial should have been declared and a reversal of this conviction

is warranted.

## CONCLUSION

Based upon the foregoing reasons, this Honorable Court should reverse the

conviction and sentence of Mr. Ayo.

Respectfully submitted,

MARGARET SMITH SOLLARS (#21122)
LOUISIANA APPELLATE PROJECT
513 COUNTRY CLUB BLVD.
THIBODAUX, LOUISIANA 70301
(985) 446-2618

## CERTIFICATE

I hereby certify that a copy of the above and foregoing brief has been hand
delivered to the District Attorney of Jefferson Parish, Gretna, Louisiana, on or before
this 25th day of June, 2008.

MARGARET SOLLARS

21

COURT OF APPEAL
FIFTH CIRCUIT

FILED   AUG - 5 2008



IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

---

NO. 08-KA-0468

---

STATE OF LOUISIANA,
                                    APPELLEE

VERSUS

GLENN C. AYO
                                    APPELLANT

---

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 07-369, DIVISION "M",
THE HONORABLE HENRY G. SULLIVAN, JR., JUDGE PRESIDING.

---

BRIEF OF THE STATE OF LOUISIANA, APPELLEE

---

PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
24th JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA

TERRY M. BOUDREAUX # 3306
ANNE WALLIS # 15063
(APPELLATE COUNSEL)

SHANNON SWAIM
(TRIAL COUNSEL)
ASSISTANT DISTRICT ATTORNEYS
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES............................................................................iii

STATEMENT OF THE CASE .......................................................................1

STATEMENT OF THE FACTS .....................................................................2

ASSIGNMENT OF ERROR ..........................................................................6

LAW AND ARGUMENT .........................................................................7-23

CONCLUSION ............................................................................................23

CERTIFICATE OF SERVICE .......................................................................23

## *TABLE OF AUTHORITIES*

### CASE LAW

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).7

*State v. Hayes*, 94-2021 (La.App. 1st Cir.11/9/95), 665 So.2d 92................8.

*State v. Williams*, 448 So.2d 753 (La.App. 2d Cir.1984). ..............9

*State v. Rogers*, 494 So.2d 1251 (La.App. 2d Cir.1986) writ denied, 499 So.2d 83 (La.1987). ..............9

*State v Hurd*, 05-258(La. App. 5th Cir. 11/29/05), 917 So 2d 567................10

*Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).10

*State v. Clennon*, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, ...............10

*State v. Mills*, 01-110 (La.App. 5 Cir. 6/27/01), 790 So.2d 102, ..............10

*State v. Frank*, 344 So.2d 1039 (La.1977)................11

*State v. Bickham*, 404 So.2d 929 (La. 1981)..............11

*State v Gilmore*, 323 So. 2d 459 (La. 1975)................13

*State v. Butler*, 01-907 (La.App. 5 Cir. 2/13/02), 812 So.2d 120, 124...............13

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)..............13

*State v. Belton*, 441 So.2d 1195 (La.1983).................13

*State v. Weinberg*, 364 So.2d 964 (La.1978). ..............14

*State v. Franklin*, 598 So.2d 1147 (La.App. 1 Cir.1992)..............14

*United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). ..............15

*State v Owens*, 565 So. 2d 1062 (La. App. 5th Cir. 1990)................16

*State v Jones*, 267 So. 2d 559, (La. 10-4-72)................17

*State v Jarvis*, 97-1174, (La. App. 5th Cir. 4-9-98), 710 So 2d 831.................17

*State v. Johnson*, 94-1379, (La.11/27/95), 664 So.2d 94, 99. ..............18

*State v Hamilton*, 02-KA-1344, (La. App. 1st Cir. 2000). 845 So. 2d 383..............20

*State v. Edwards*, 420 So.2d 663, 675 (La.1982). ..............22

*State v. Smart*, 05-KA-814, (La.App. 5 Cir.,2006) 926 So.2d 637, 647..............22

### STATUTORY LAW

LSA-R.S. 14:64..............1

La. C. Crim. Pro. Art.213..............14

La. C. Crim. Pro. Art.214..............17

La. C. Crim. Pro. Art 770..............18

La. C. Crim. Pro. Art 771..............18

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

NO. 08-KA-0468

STATE OF LOUISIANA,
                                        APPELLEE
VERSUS,

GLENN C. AYO, APPELLANT

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 07-369, DIVISION "M",
THE HONORABLE HENRY C. SULLIVAN, JR., JUDGE PRESIDING.

BRIEF OF THE STATE OF LOUISIANA, APPELLEE

## STATEMENT OF THE CASE

On January 19, 2007, the defendant was charged by bill of information with one count of armed robbery, while armed with a dangerous weapon, to wit, a knife, a violation of LSA-R.S. 14:64. (Vol. 1, p. 23). A motion to suppress identification, at issue in this appeal, was heard, re-reurged at trial, and denied. (Vol. 1,p. 9, 79-127, 233). Trial was held on November 27, 2007, and the following day, the defendant was found guilty as charged in a one hour verdict. (Vol. 1, p. 18-20, 57). A motion for new trial was head and denied. (Vol. 1, p. 59, 60-67). The defendant was subsequently sentenced to 87 years at hard labor, without benefits. (Vol. 1, p. 59). A multiple bill was filed and subsequently dismissed by the state. (Vol. 1,p. 68). A motion for appeal was filed on December 17, 2007. (Vol. 1,p. 70).

## STATEMENT OF THE FACTS

At trial **Officer Jewel** testified that his family owns the building located at 250 Iris, which is "a warehouse used for storage by Jefferson Variety store." The building, located in Jefferson Parish, is used to store Mardi Gras throws. (Vol. 1, p. 156-157, 169). At about 9:00 a.m. he was notified of an armed robbery that had just happened in front of his store. (Vol. 1,p. 157). He immediately met with the victim who informed the officer that he had just been armed robbed with a knife. The victim, a 87 year old man, described the perpetrator as a white male, dark hair, clean shaven, wearing a blue-hooded jacket." (Vol. 1,p. 158).

Using the description given by the victim, Officer Jewel canvassed the area in search of the perpetrator. Meanwhile, he was notified by other officers that a suspect had been stopped . As officer Jewel heard the broadcast of a suspect being stopped, he noticed the defendant, a white male, with dark hair, clean shaven, and carrying a gym bag. The defendant also had a "knife sticking out of his back pocket." The defendant was spotted by Officer Jewel about two blocks from where the armed robbery happened. (Vol. 1, p. 169-170, 182). The victim was brought by other officers to the first suspect who was stopped. The victim stated that the stopped suspect was not the perpetrator. Upon learning that the victim failed to identify the first suspect, Officer Jewel, thinking that the person he previously spotted may be the perpetrator, canvassed the area in an attemp to locate him. Officer Jewel learned that the suspect he was searching for, which later proved to be the defendant, had entered a taxi cab headed toward New Orleans. The taxi, however, had been stopped by other officers at a gas station in New Orleans. (Vol. 1, p. 164-165, 170). The defendant, who was the person inside of the taxi, was identified by Officer Jewel as "absolutely" the same person that officer Jewel previously saw walking two blocks from the armed

2

robbery. (Vol. 1,p. 174). The victim was subsequently brought to the gas station

where he made a positive "one hundred percent identification" of the defendant., even

though the defendant was now wearing a green shirt instead of the blue hooded shirt

the victim said the was wearing at the time of the robbery. (Vol. 1,p. 175, 204). At the

time of the defendant's arrest, he was in possession of a knife and the blue hooded

sweatshirt with a zipper was found in a bag that belonged to the defendant. (Vol. 1

p. 180-181, 209).

The **taxi cab driver** testified, in pertinent part, that he picked the defendant up

on the date in question near the place and time where the armed robbery happened.

(Vol. 1, p. 192-194). He drove the defendant to the gas station in Orleans Parish

where the defendant was late arrested.

**Officer McCoy** testified that he was dispatched to 250 Iris " on an armed

robbery involving a knife and a pedestrian." (Vol. 1, p. 198). He met with the victim

who told him that he was robbed by a "white male, kind of slender, about 5"8" who

weighed about 150 pounds. (Vol. 1, p. 199). He was wearing "a dark blue or navy

blue jacket with a hood on it..." This officer took the victim to view the first suspect

who had been stopped and the victim stated that "No, it definitely wasn't him." (Vol.

1,p. 201). Officer Jewel called in over the police radio that he saw a suspect fitting

the description "getting into a blue service cab" but by the time "he had turned around

to go try to stop him, the cab had already taken off on Jefferson Highway and was

headed toward New Orleans." (Vol. 1, p. 201). The taxi was later spotted at a gas

station in New Orleans. The defendant was taken out of the cab, placed on the hood

of the police unit, but was "trying to get away." (Vol. 1, p. 202) A knife was taken

out from the defendant's back pocket and he was then handcuffed. (Vol. 1. P. 204-

205, 218). A bag was found on the back seat of the cab with a blue hooded sweatshirt

5

laying on top of it. (Vol. 1, p. 209, 218). The victim remained inside of the police unit but upon seeing the defendant, he immediately stated "that's him." (Vol. 1, p. 204). Wanting to be one hundred percent sure of his identification, the victim exited the police unit to have a "closer look" at the defendant. The victim then stated "that's definitely him." (Vol. 1, p. 207). At the time of the defendant's arrest, he had "money in his hand which he dropped on the ground." (Vol. 1, p. 219-220).

**Officer Simoneaux** testified that he stopped a suspect but released him after the victim stated that he was not the person who robbed him. Having learned that a suspect meeting the description had entered a taxi cab, the officer canvassed the area in search of the taxi. In Orleans Parish, he spotted "a cab driver get out with the subject" whom the officer believed to be the suspect that officer Jewel was looking for. The suspect in the taxi fit the description that officer Jewel had broadcast as being the person he saw walking in the area carrying a bag. (Vol. 1, p. 237). The suspect, later learned to be the defendant, was seen handing money to the cab driver. The defendant was also seen with a knife in his right rear pocket. (Vol. 1, p. 237; Vol. 2, p. 257). Seeing the knife and knowing that the suspect fit the description of the perpetrator, the officer "grabbed the defendant's right wrist and took the knife out from his back pocket. (Vol. 1, p. 239). The defendant struggled and the officer then held the defendant "in the compliance hold and got him on the hood of my car holding him." (Vol. 1, p. 239). The defendant placed money that was crumpled in his hand on the hood of the police unit. (Vol. 1, p. 240).

**The victim**, a 87 year old victim at the time of the crime, testified that he has no health issues that would affect his eyesight or memory. (Vol. 2, p. 262). At about 9:00 a.m. on the date of the offense, he was armed robbed at 250 Iris street. (Vol. 2, p. 263-264). The person who robbed him, identified by the victim both on the scene

and at trial as the defendant, was wearing a blue hooded jacket that was zipped up at the time time of the robbery.  (Vol. 2, p. 268, 270). The defendant did not wear the hood during the robbery, but rather, placed it on his head after the victim gave the defendant the money. (Vol. 2, p. 268). At one point, the defendant and the victim were about one foot apart and the defendant was not wearing his hood. (Vol. 2, p. 268). The victim gave the defendant $28.00 in cash in the denominations of a twenty dollar bill, a five dollar bill, and three dollar bills. (Vol. 2, p. 269). After the victim gave the defendant the money, the defendant walked away only to return to the victim and tell him, "if you get up, I'm going to stick you." (Vol. 2, p. 270). The defendant then left the scene headed toward Jefferson Highway, the very location where Officer Jewel first spotted the defendant. (Vol. 2, p. 271). The police were called and the victim described the defendant as about 5'7" or 5'8", wearing a blue hooded jacket, slim, and whose weight he was not certain of because he is "not too good at weights." (Vol. 2, p. 273).

The victim was taken by officers to where officers had stopped a suspect. The victim told officers that the person stopped was not the person who robbed him. (Vol. 2, p. 274). About one hour after the offense, the defendant was stopped at a gas station in New Orleans and the victim was brought to that location to see if he could identify the defendant. The victim positively identified the defendant as the person who armed robbed him. (Vol. 2, p. 275, 282). The victim was asked on direct examination "if it wasn't the guy who robbed you or you weren't sure, would you tell the jury?" The victim responded that he "would tell them I wasn't sure." The victim was certain of his identification even though the defendant at the time he was stopped was wearing a different shirt from the one he was wearing when he robbed the victim. (Vol. 2, p. 276). Although the victim could not identify the defendant at motions, he could

positively identify the defendant at trial as the person who robbed him. (Vol. 2, p. 279). [1]

The **defendant testified** that he never robbed the victim. On January 6, 2007, he spent the night at his girlfriends home. At about 9:00 a.m. he left her home en route to his apartment which is located in the near vicinity of where this armed robbery occurred. (Vol. 2, p. 312-313). While en route to his apartment, he walked down Cicero Street to a friend's home. While at the friend's home he "called for a cab." (Vol. 2, p. 314). He also asked the friend if he, the defendant, could "borrow a knife" that he wanted to shear copper. The friend gave him a knife, which was the knife the defendant was later found in possession of. (Vol. 2, p. 316). The friend also sold to defendant the "travel bag" and the blue hooded jacket found by officers inside the travel bag. (Vol. 2, p. 319). The defendant then entered a taxi at the corner of Jules and Jefferson Highway, the same location where officer Jewel reported that the defendant was seen entering a cab. (Vol. 2, p. 317). The defendant relocated to the Spur Gas Station in Orleans Parish. Officers arrived at the station, and seeing a knife in the defendant's back pocket, "took it out." (Vol. 2, p. 322). The defendant admitted that consistent with police officer testimony, he struggled with officers as they placed the defendant on the hood of the police unit. (Vol. 2, p. 323).

### *ASSIGNMENT OF ERROR*

The Appellant asserts the following two assignments of error:

(1) The trial court erred by failing to suppress the identification of the defendant and the defendant's arrest was illegal.

(2) A mistrial should have been granted.

---

[1] The reasons why the victim could not make an identification at motions is explained below in the argument.

### CLAIM ONE
### IDENTIFICATION AND ILLEGAL ARREST
### LAW AND ARGUMENT

The defendant asserts not only that the evidence of identification was insufficient, but that the identification procedure was suggestive. Specifically, he states that the evidence of identification was *insufficient* because the victim, an elderly 87 year old man, was unsure of his identification of the defendant and that the description the victim gave of the defendant was different from what the defendant actually looked like. (Defense brief, p. 7). He states that the identification was suggestive because the victim knew, when making his positive identification, that the defendant had been arrested as a suspect and thus his identification was tainted by this knowledge. (Defense brief, p. 9).

#### Sufficiency

In reviewing claims challenging the sufficiency of the evidence or identification as is the case here, the appellate court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The defense suggests that the victim's description of the defendant was not consistent nor detailed enough to warrant a positive identification. However, the record shows that the victim was not only consistent in his description of the defendant, but he was also positive that the defendant was the person who placed a knife to his throat and robbed him. Although the defense contends that the victim never could make a positive identification because the victim gave several different descriptions of the defendant, the record shows that the victim never gave more than

7

one description of the defendant. The defendant was consistently described by the victim as a white male, wearing a blue jacket with a hood and a zipper, dark hair, clean shaven, and about 5'9", wearing jeans, and although the victim is "not a good judge of how much a person weighs", he thought the defendant weighed about 150 or 165 pounds and "was not fat." (Vol. 1, p. 81, 84, 91, 105, 112, 158, 199; vol. 2, p. 273). When the defendant was arrested, he was a white male, "below average in weight and height," he had black hair or dark brown hair, was clean shaven and was about 5'5" in height. (Vol. 1, p. 178, 182). He was in possession of a hooded blue jacket with a zipper, and a knife in his back pocket. (Vol. 1, p. 182). The victim testified that the blue jacket was "the same one" and the knife "looked like the same knife." (Vol. 1, p. 87, 95, 118).

The victim's view of the defendant was unobstructed during each of the three times that the victim viewed the defendant's face. (Vol. 1, p. 124). When he first saw the defendant, the victim was about twenty feet from him. After the defendant approached him and placed a knife to the victim's throat, the defendant and the victim were face to face and the victim had a "good look at him then" from only one foot away. (Vol. 1, p. 82-83; vol. 2, p. 268). After robbing the victim, the defendant left the scene only to return and tell the victim not to get up from the ground or "I'll stick you." (Vol. 1, p. 83; vol. 2. p. 270). During the robbery, the defendant was not wearing the hood on the blue hooded jacket that he was wearing. He only placed the hood on his head after telling the victim not to "stare at me so you can identify me." (Vol. 1, p. 84; Vol. 2. p. 268). Given that the victim was able to view the defendant's face on each of three occasions, the victim was positive of his identification. (Vol. 1, p. 86; Vol. 2, p. 276). Positive identification by only one witness is sufficient to support a conviction. *State v. Hayes*, 94-2021 (La.App. 1st Cir.11/9/95), 665 So.2d

8

92, 94, *writ denied*, 95-3112 (La.4/18/97), 692 So.2d 440. It is not the function of a

court of appeal to evaluate the credibility of witnesses. *State v. Williams*, 448 So.2d

753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's

decision to accept or reject the testimony of a witness in whole or in part. *State v.*

*Rogers*, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).

The jury found that the victim was positive in his identification of the defendant and

that finding should stand.

The defense asserts that although the victim identified the defendant one hour

after the robbery and again at the trial, the victim could not identify the defendant at

the motion hearing.(Vol. 1,p. 71, 86, 139). However, the reason for this alleged lapse

in identification at motions was easily explained by the victim. Although he thought

that he spotted the defendant in the crowded courtroom on the day of motions, he was

not able to make a positive identification at motions because"there was a crowd of

people all here...and they were wearing the same thing." (Vol. 2, p. 280-281). In fact,

the victim testified that although asked to do so, he never really made a concerted

effort to identify anyone that day because the courtroom was very crowded. As a

result, the victim never really looked around the courtroom that day nor did he "look

really at each person."(Vol. 2,p. 281, 285). Although he had an idea that he could

identify the defendant and thought that he spotted him in the crowded courtroom, he

"would never say without being sure" thus he chose not to identify anyone the day of

motions. (Vol. 2, p. 285).

The victim in this case never wavered in his identification of the defendant, not

even when the defendant was wearing a green shirt upon his arrest instead of the blue

hooded jacket that the victim said he was wearing. In order to convict on this instant

offense, the state had to prove that the defendant took money from the victim by

force, while the defendant was armed with a knife. The question presented by the defense is one of identify, that is, whether or not the state proved that the defendant is the one who committed the offense. The record shows that the state carried its burden or proof far and beyond what the defense alleges. This claim has no merit.

### Suggestive identification

The defendant argues that the one-on-one identification was suggestive because he was handcuffed at the time of the identification and was the only person viewed by the victim. The likelihood of misidentification in this case would be an unreasonable conclusion because the victim's identify is reliable and not subject to mis-identification. When challenging an identification procedure, the defendant must prove the identification was suggestive and that there was a substantial likelihood of misidentification. It is the likelihood of misidentification that violates due process, not the mere existence of suggestiveness. *State v. Hurd*, 05-258 (La.App. 5 Cir. 11/29/05), 917 So.2d 567, 570, *writ denied*, 06-1128 (La.11/17/06), 942 So.2d 530. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *State v. Clennon*, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. Factors to consider in assessing the reliability of an identification include: 1) the witness' opportunity to view the criminal at the time of the crime, 2) the witness' degree of attention, 3) the accuracy of his prior description of the criminal, 4) the level of certainty demonstrated at the confrontation, and 5) the time between the crime and the confrontation. *Manson v. Brathwaite*, 97 S.Ct. at 2253; *State v. Mills*, 01-110 (La.App. 5 Cir. 6/27/01), 790 So.2d 102, 107.

Generally, one-on-one identifications are not favored; however, such an

10

identification procedure is permissible under certain circumstances. For example, one-on-one identifications are justified when the accused is apprehended within a relatively short period of time after the occurrence of the crime, as is the case here, and when the accused has been returned to the scene for immediate identification. *State v. Hurd*, supra. Immediate confrontation assures the reliability of the identification as the perpetrator's appearance is fresh in the witness' mind, lessens the possibility that the perpetrator's clothes or appearance will be changed, and insures early release of innocent subjects. *State v. Frank*, 344 So.2d 1039, 1041 (La.1977).

The trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Bickham*, 404 So.2d 929, 934 (La. 1981). In determining whether a ruling on a motion to suppress was correct, the reviewing court is not limited to the evidence adduced at the hearing on the motion, but may consider all pertinent evidence given at the trial of the case. *State v. Temple*, 01-KA-655, 806 So.2d 697(La.App. 5 Cir.,12/12/2001).

With regard to the identification being suggestive in this case, the defense indicates that because the victim knew that a suspect had been detained, his identification of the suspect as the perpetrator was tainted by that fact. However, there is nothing in the record to indicate that the positive identification of the defendant as the robber was based on anything other than the victim's certainty that the defendant was in fact the robber. Testimony both at motions and trial indicates that before detaining the defendant, police had stopped another suspect about thirty minutes after the robbery. (Vol. 1, p. 93). The victim was escorted in a police unit to where this suspect was detained. Upon arrival, the victim told officer that "no, that's not the man. He wasn't Mexican, he was a white man." (Vol. 1, p. 85, 98, 201). After informing

11

police that the person they detained was not the person who robbed him, the

defendant was subsequently stopped as fitting the victim's description of the robber.

The victim was then escorted to where the defendant was being detained and upon

arrival, immediately and positively identified the defendant as the person who robbed

him. (Vol. 1,p. 85, 204, 207).While being escorted, the officer told the victim only

that "they had someone on Eagle and Claiborne." The officer made no suggestion

whatsoever to the victim that the person stopped on Eagle and Claiborne was the

person who robbed him. (Vol. 1, p. 93-94, 116; vol. 2, p. 275). Nor does the record

show that the identification procedure was suggestive simply because the defendant

was "bent over the fender of the police car" at the victim's arrival. (Vol. 1, p. 94).

Despite the defendant being bent over the police unit, the victim asked officers if he

could get "a little closer" to the victim so as to be sure of his identification. (Vol. 1,p.

85, 115; vol. 2, p. 275). He asked this because he "didn't want to just say yes that was

the gentlemen." (Vol. 2, p. 282).

### *ILLEGAL ARREST*

The defense asserts that the defendant's arrest was illegal for two reasons; (1)

there was no warrant for the defendant's arrest and no  probable cause for the

defendant's arrest, and the stop itself was illegal; and (2) the arrest was illegal because

the officers, who are employed in Jefferson Parish, had no jurisdictional authority to

arrest the defendant in Orleans Parish.

A warrantless arrest, no less than an arrest pursuant to a validly issued warrant,

must be based on probable cause. Probable cause to arrest exists when facts and

circumstances within the arresting officer's knowledge and of which he has reasonable

and trustworthy information are sufficient to justify a man of average caution in the

belief that the person to be arrested has committed or is committing an offense. *State*

*v. Gilmore*, 323 So.2d 459 (La.1975).

### *PROBABLE CAUSE*

In a hearing on a motion to suppress, the State has the burden of establishing the admissibility of evidence seized without a warrant. LSA-C.Cr.P. art. 703(D). The trial court's denial of a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression. In determining whether the trial court's ruling on a defendant's motion to suppress is correct, the appellate court is not limited to the evidence adduced at the suppression hearing. It may also consider the evidence presented at trial. *State v. Butler*, 01-907 (La.App. 5 Cir. 2/13/02), 812 So.2d 120, 124.

The right of law enforcement officers to stop and interrogate one reasonably suspected of criminal activity is recognized by LSA-C.Cr.P. art. 215.1 as well as state and federal jurisprudence. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Belton*, 441 So.2d 1195 (La.1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). The right to make an investigatory stop and question the particular individual detained must be based on reasonable suspicion to believe that he has been, is, or is about to be engaged in criminal activity. The "reasonable suspicion" necessary for an investigatory stop is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. *State v. Young*, 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 96).

Both State and Federal Constitutions require that "seizure" of a person by law enforcement official be founded upon objective justification and when seizure takes the form of an arrest, the police officer must have probable cause to believe the

person arrested has committed an offense. La. Const. Art. 1, § 5; U.S.C.A. Const. Amend. 4; La.Code Crim. Proc. art. 213. Probable cause to arrest exists when the facts and circumstances within an officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the accused has committed an offense. Probable cause to arrest is not absolute cause, and to determine its existence, courts must examine facts and circumstances within the arresting officer's knowledge in light of the experience of reasonable people, not legal technicians. For probable cause to arrest, the law does not require that "reasonable cause to believe" be established by evidence sufficient to convict. La.C.Cr.P. art. 213; *State v. Weinberg*, 364 So.2d 964 (La.1978). Probable cause for an arrest must be judged by the probabilities and practical considerations of everyday life in which average people, and particularly average police officers, can be expected to act. *State v. Franklin*, 598 So.2d 1147 (La.App. 1 Cir.1992), writ denied,604 So.2d 1317 (La.1992).

The defense maintains in this appeal that at the moment the officers "put his hands on Mr. Ayo, an arrest occurred but that the officer failed to have probable cause to arrest. However, the record shows that officers did have both probable cause to arrest and reasonable suspicion to stop the defendant. Officers knew that defendant entered a taxi and that he fit the description of the person who had just committed an armed robbery. They also knew that the defendant was in possession of a knife. Thus, the stop was founded upon objectively reasonable suspicion supported by specific and articulable facts, i.e., the description of the robber and his distinctive clothing. Knowing that the taxi picked the defendant up only blocks away from the crime scene and knowing that the defendant fit the description of the perpetrator, the officers had a right to stop the defendant and to allow the victim the opportunity to

identify him. There was at least a minimal level of objective justification for the stop

of the defendant, and thus, the stop was constitutional.

Once stopped, and in a diligent attempt to pursue a means of investigation that

was likely to quickly confirm or dispel the suspicions of the police that the defendant

was the robber, the defendant was properly held for the victim to view. *See United*

*States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

The objectively reasonable suspicion ripened into probable cause to arrest when the

victim identified the defendant as the robber. This claim has no merit.

### *JURISDICTION TO ARREST*

The record shows that the defendant was arrested in Orleans Parish by officers

who were employed by Jefferson Parish.[2] (Vol. 1, p. 197. However, the defendant was

seen "getting into a cab" in Jefferson Parish, about four blocks from where the armed

robbery occurred. (Vol. 1, p. 114, 118). The taxi "headed towards New Orleans on

Jeff Highway." Upon learning this information, the off duty officer broadcast this

information to other units. At the point of hearing this broadcast, that is, that the taxi

was spotted and person inside the taxi fit the description of the person who had just

committed an armed robbery, Jefferson Parish units "turned around" and "started after

the cab." (Vol. 1, p 114, 202, 236). The officers lost sight of the taxi as they were

entering "into the Orleans Parish line." (Vol. 1, p. 99, 236). In an effort to locate it,

the officers began to look "down the side streets to see if" they could locate it. (Vol.

1, p. 237). At the corner of Eagle and Claiborne, and after entering New Orleans, the

Officers spotted the taxi at gas station, which was only a "few blocks" from where the

---

The defendant filed a motion to suppress in the form of a pro se "22 points of law" document
contesting his arrest on jurisdictional grounds. He claimed, as he does now, that Jefferson Parish
officers had no authority to arrest him in Orleans Parish. (Vol. 1, p. 15-16, 29, 141) The trial court
denied the motion. (Vol. 1, p. 145).

robbery happened. The defendant was approached and arrested. (Vol. 1, p. 114, 144).

Jurisprudence and statutory law allow officers who begin the pursuit of a defendant in their territorial jurisdiction and pursue the fleeing vehicle beyond that jurisdiction to stop the vehicle in question, even if the vehicle is stopped outside the officers jurisdiction. *State v. Owens*, 565 So.2d 1062 (La.App. 5th Cir.1990). C. Cr. Pro. Art. 213.[3] Here, the defendant was first spotted within the officers territorial jurisdiction of Jefferson Parish. He was seen, as the suspect matching the description of the perpetrator, entering a taxi in Jefferson Parish only a short distance away from where the armed robbery occurred. (Vol. 1,p. 192, 194). The exigent situation in which the officers found themselves, that is, in pursuit of a suspect in a moving vehicle, gave the officers little time to do anything other than what they did and should have done; follow the taxi until the defendant was apprehended .Given that officers were in close pursuit of the defendant, and given that case law and statutory law allows for officers to cross jurisdictional lines in close pursuit of a subject, officers had the authority to continue to pursue him into Orleans Parish and to effectuate the arrest there.

Although officers had downgraded their pursuit from a code two, which requires "lights and sirens" and allows excess speed limits, to a code one, which mandates that officers "follow all the traffic rules", this reflected not a diminished level of pursuit but a concern for officer safety. (Vol. 1, p. 160). The officers did not

---

Article 213 reads, in pertinent part:

A peace officer may, without a warrant, arrest a person when:
(1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit;
(2) The person to be arrested has committed a felony, although not in the presence of the officer;
(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer; or

A peace officer in close pursuit of a person to be arrested, who is making an arrest pursuant to this Article *may enter another jurisdiction in this state and make the arrest.*

16

enter Orleans Parish looking only to pursue a criminal, rather, the officers came upon the defendant in their own jurisdiction and as the intensity of the situation increased from the defendant entering a cab with a knife in his pocket and escaping down Jefferson Highway, the officers did and should have made the good faith attempt to stop the taxi..

Should this Court find that the officers did not have the jurisdictional authority to arrest the defendant in Orleans Parish, under LSA-C.Cr.P. art. 214, the officers still had the right as private citizens to arrest the defendant for armed robbery because the defendant had just committed a felony, armed robbery. [4] *See, State v Jones*, 267 So. 2d 559, (La. 10-4-72) ( police officer who is without *official* authority to make an arrest may nevertheless make the arrest if the circumstances are such that a private citizen would have the right to arrest). In *State v Jarvis*, 97-1174, (La. App. 5th Cir. 4-9-98), 710 So 2d 831, a St. Charles Parish officer stopped and arrested a defendant in LaFourche Parish. The arresting officer was aware that he had no jurisdiction to make an arrest outside of his own parish of St. Charles. The officer first came upon the defendant as the defendant was walking along the side of the road. This Court held that the defendant should have been arrested with the assistance of Lafourche Parish officers and because he was not, the arrest was illegal. However, this Court ruled that under La. Code Crim. P. art. 214, the officer properly arrested defendant as a private citizen. In *State v. Bickham*, supra, the Louisiana Supreme Court rejected a defendant's contention that the remedy necessary for enforcement of the territorial jurisdiction rule is exclusion of reliable evidence produced as a result of arrests or

---

[4]LSA-C.Cr.P. Art. 214 ;
A private person may make an arrest when the person arrested has committed a felony, whether in or out of his presence

stops initiated in good faith by an officer who began to act within his territorial limits.

This claim has no merit.

## CLAIM TWO
## MISTRIAL

The defense asserts that a mistrial should have been granted when the state introduced other crimes evidence by questioning the defendant on cross about whether or not he was on parole and whether or not an attachment had been issued for his arrest. Without "certified court documents" showing that the defendant was wanted in another jurisdiction, the defense asserts that a mistrial should have been granted. The defense also asserts that a mistrial should have been granted when the state asked the defendant on cross about the conviction record of a defense witness who failed to show at trial.

### OTHER CRIMES EVIDENCE

The defense claims that the state's reference to the defendant's parole status was evidence of other crimes and a mistrial should have been granted. LSA-C.Cr.P. art. 770(2) prohibits reference by a judge, a district attorney, or a court official to other crimes by the defendant as to which evidence is not admissible under penalty of mandatory mistrial. Generally, evidence of other crimes or bad acts is inadmissible at a criminal trial unless the probative value of the evidence outweighs its prejudicial effect, and unless it falls under one of the statutory or jurisprudential exceptions to this exclusionary rule. See State v. Johnson, 94-1379, pp. 9-10 (La.11/27/95), 664 So.2d 94, 99. LSA-C.Cr.P. art. 771 provides:

> In the following cases, upon the request of the defendant or the state, the court **shall** promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district

18

Case 2:13-cv-04580-CJB-ALC   Document 3-2   Filed 07/15/13   Page 48 of 116


attorney, or a court official, and the remark is not within the scope of
Article 770; or

(2) When the remark or comment is made by a witness or person other
than the judge, district attorney, or a court official, regardless of whether
the remark or comment is within the scope of Article 770.

• In such cases, on motion of the defendant, the court may grant a
mistrial if it is satisfied that an admonition is not sufficient to
assure the defendant a fair trial

Mistrial is a drastic remedy which should be declared only when unnecessary

prejudice results to the accused. The determination of whether prejudice has resulted

lies in the sound discretion of the trial judge. A mistrial is a drastic remedy and is

warranted under La. Code Crim. Proc. art. 770 only when a remark or comment

referencing an accused's commission of other crimes results in prejudice to his

substantial rights sufficient to undermine the fairness of trial." *State v. Broaden*,

99-2124 (La.2/21/01), 780 So.2d 349.

On direct examination, the defendant was questioned about his prior

convictions. (Vol. 2, p. 328). The defendant acknowledged that he was convicted in

1991 of two counts of "sales of a controlled substance" stemming from a Santa Rosa

County Florida conviction. He also informed the jury that he was previously

convicted in 1994 of manslaughter stemming from a St. Augustine Florida conviction.

With regard to the Santa Rosa drug conviction, the state asked the defendant if he was

on parole for that conviction to which the defendant answered that he was not. The

state then asked him if he would be surprised to "know that there's actually a detainer

on you in Santa Rosa to have you shipped there when we're done with you here?"

(Vol. 2, p. 330). The defense moved for a mistrial stating that the defendant's parole

status should not have come up in front of the jury. The motion was denied by the

trial court without opinion. (Vol. 2, p. 332). However, the trial court stated that the

"court's going to order that last question and any response be stricken from the

record." (Vol. 2, p. 332-333). The court then told the jury ".[T]he court orders that the the last question and any response be stricken from the record. You're to disregard it." (Vol. 2, p. 333).

The trial court was correct in denying the motion for mistrial and issuing only an admonition. The defendant testified at trial and exposed the existence and nature of his criminal history to the jury. The answer of whether or not the defendant was on parole was ambiguous and incomplete, with the defendant stating that he was not and the state stating that he was on parole. Given that the jury already heard that the defendant was convicted of manslaughter, the very offense that referenced the parole cross examination, the defendant did not suffer any further prejudicial effect. Any parole status that the defendant had was not evidence of another crime but merely a cumulation to the crime of manslaughter. See, *State v. Hamilton* 845 So.2d 383, 391, 2002-1344 , 9 (La.App. 1 Cir.,2000).

### *DEFENSE WITNESS-FELONY CONVICTIONS*

The defense alleges that the state's questions to the defendant on cross examination about the felony convictions of an absent defense witness, Theo Brickley, was prejudicial. It was allegedly prejudicial in that "the references to these convictions were clearly designed to make Mr. Ayo guilty by association." (Defense brief, p. 19). The defendant had testified on direct examination that on the morning of the robbery, he was walking "down Carrollton, when someone recognized me that knows me and picked me up, named Theo Brickley." He testified that Brickley gave him a ride to his apartment and that he arrived at his apartment at about 9:15 a. m. (Vol. 2, p. 313). The robbery in this case happened at about 9:00 a.m., thus in effect, giving the defendant an alibi that he was with Brickly at the time of the offense. At trial the following transpired on cross examination of the defendant.

**State**: Theo Brickley here?

**Defendant**: Does he live here?

**State**: Is he going to testify?

**Defendant:** No, ma'am, he's not. The Clerk was unable to serve him.

**State:** The clerk was unable to serve him. Y'all couldn't find him? Now, you do know that your good bud, Theo Brickley

**Defense attorney**: Objection, your Honor.

**State**: Just got guilty for like four felonies in Division O.

The defense objected to the above examination stating that Theo Brickley is not "subject to impeachment cause he hasn't testified...we hadn't brought him up except to the extent that he game him a ride." (Vol. 2, p. 336). The state responded that "that's an alibi...he just pled guilty less than a month ago in Division O, and he's saying that couldn't locate him. He's on probation...he can just throw out his name as an alibi, but he's not here?" (Vol. 2, p. 336). The state concluded by stating that "I think the fact that less than a month ago he was in court, okay, and he throws him out as an alibi, and I can't question him why he can't find him?" A motion for mistrial was made and the trial court denied it and also denied the defense request for an admonition. (Vol. 2, p. 338).

Brickley's credibility as an alibi was not diminished nor compromised by the fact of his felony history. His felony history was brought out by the state to rebut the defendant's statements that he could not locate the witness to serve him. By informing the jury that the witness had just pled guilty to a crime, the state was merely informing the jury that Brickey was not hard to locate, as the defendant said he was. The state was attempting to show that the witness could have been located because he "has a parole officer" and was on probation. (Vol. 2,p. 336). The passing reference to the above did not imply that the missing witness would or would not present favorable testimony for the defendant. Rather, it merely indicated that the

witness could be located, despite the defendant stating on cross examination that he could not be served. The fact that the defense brought up that it could not serve the witness prompted the state to explain that the witness was in fact within easy reach. Accordingly, the state's cross examination was not improper given that the defense opened the door to the witnesses whereabouts. It is well recognized that when one side has partially gone into a matter during its direct examination, the other side may fully go into it on cross-examination. *State v. Edwards*, 420 So.2d 663, 675 (La.1982). Any doubt as to the propriety or extent of cross-examination is resolved in favor of the cross-examination. *State v. Edwards*, supra. *State v. Smart* 926 So.2d 637, 647 (La.App. 5 Cir.,2006).

### ERROR PATENT

This Court routinely reviews the record for errors patent regardless of whether the defendant makes such a request. La.C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La.1975); *State v. Weiland*, 556 So.2d 175 (La.App. 5 Cir.1990). There are no errors patent requiring corrective action.

### CONCLUSION

The State of Louisiana respectfully asks this Honorable Court to affirm the conviction and sentence of Glenn Ayo.

Respectfully submitted,

Anne Wallis, #15063
Assistant District Attorney
200 Derbigny Street
Gretna, Louisiana 70053
(504) 368-1020

22

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served on all parties by

placing same in the United States mail, postage prepaid, this _5ᵗʰ_ day of

_August_ 2008.

Anne M. Wallis

23

FIFTH CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA

DOCKET NUMBER: 08-KA-0468

GLENN CHARLES AYO,
APPELLANT

-VS-

STATE OF LOUISIANA,
APPELLEE

PRO SE SUPPLEMENTAL BRIEF

ON BEHALF OF APPELLANT
GLENN CHARLES AYO

ON APPEAL FROM THE 24TH JUDICIAL DISTRICT COURT,
IN AND FOR JEFFERSON PARISH, LOUISIANA, CASE NO. 07-369,
THE HONORABLE HENRY C. SULLIVAN, JR., PRESIDING

GLENN CHARLES AYO #531823
MAIN PRISON
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

# TABLE OF CONTENTS

PAGE

JURISDICTIONAL STATEMENT.................................................................1

ASSIGNMENTS OF ERROR....................................................................1

STATEMENT OF CASE..........................................................................2

STATEMENT OF FACTS.........................................................................2

ARGUMENT ASSIGNMENT OF ERROR NO. 1.........................................5

ARGUMENT ASSIGNMENT OF ERROR NO. 2.........................................9

ARGUMENT ASSIGNMENT OF ERROR NO. 3.........................................14

ARGUMENT ASSIGNMENT OF ERROR NO. 4.........................................19

ARGUMENT ASSIGNMENT OF ERROR NO. 5.........................................21

ARGUMENT ASSIGNMENT OF ERROR NO. 6.........................................24

ARGUMENT ASSIGNMENT OF ERROR NO. 7.........................................27

ARGUMENT ASSIGNMENT OF ERROR NO. 8.........................................30

ARGUMENT ASSIGNMENT OF ERROR NO. 9.........................................33

ARGUMENT ASSIGNMENT OF ERROR NO. 10.......................................39

ARGUMENT ASSIGNMENT OF ERROR NO. 11.......................................40

CONCLUSION...................................................................................41

AFFIDAVIT / CERTIFICATION..............................................................42

## TABLE OF AUTHORITES

**PAGE**

### CONSTITUTIONAL PROVISIONS:

Fourth Amendment, U.S. Constitution ............... 5, 8-9, 12-14, 19, 21, 22, 24, 27, 30

Fifth Amendment, U.S. Constitution ............... 19

Sixth Amendment, U.S. Constitution ............... 14, 27, 30-31, 33, 39, 40

Eighth Amendment, U.S. Constitution ............... 30

Fourteenth Amendment, U.S. Constitution ...... 5, 9, 14, 19, 21, 22, 24, 27, 30, 33, 39, 40

Article V, Section 5 of the Louisiana Constitution ............... 3

### STATUTES:

18 U.S.C.A. § 3182 ............... 30

La.C.C.P. Art. 2132 ............... 35

La.C.Cr.P. Art. 213 ............... 7, 8

La.C.Cr.P. Art. 228(A) ............... 30

La.C.Cr.P. Art. 770 ............... 37

La.C.Cr.P. Art. 771 ............... 37

La.C.Cr.P. Art. 921 ............... 40

La.C.E. Art. 403 ............... 37

La.C.E. Art. 404(B)(1) ............... 33

La.C.E. Art. 611(B) ............... 10

La.C.Cr.P. Art. 213(3) ............... 9, 11

La.C.Cr.P. Art. 213(4) ............... 8-9, 11

La.R.S. 14:64 ............... 2

La.R.S. 14:108 ............... 2

### CASES:

Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) ............... 8, 20, 22

Bright v. State, 776 So.2d 1134 (La. 2000) ............... 29

Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ............... 40

Chatzicharalambus v. Petit, 430 F.Supp. 1087 (E.D. La. 1977) ........................ 39

Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ............ 24

Code v. Montgomery, 799 F.2d 1481 (11th Cir. 1986) ................................ 31

Coolidge v. New Hampshire, 403 U.S. 553, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ...... 24

Coungeris v. Sheahan, 11 F.3d 726 (7th Cir. 1993) .................................. 39

Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) ................ 10

Derden v. McNeel, 978 F.2d 1453 (5th Cir. 1992) ................................ 40, 41

Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) ............. 8

Dunn v. U.S., 307 F.2d 883 (5th Cir. 1962) ........................................ 37

Ex Parte Reggel, 114 U.S. 642, 5 S.Ct. 1148, 29 L.Ed.2d 250 (1885) ................. 30

Guillie v. Dept. of Transp. and Dev., 538 So.2d 1144 (La. App. 5 Cir. 1989) ........ 35

Harrison v. Quarterman, 496 F.3d 419 (5th Cir. 2007) .............................. 33

In the Interest of Solomon, 672 So.2d 1039 (La. App. 4 Cir. 1996) ................. 35

Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ........... 27

Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) .................. 25

Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ......... 14-15, 17

Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985) ................................ 31, 33

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979) ............................ 18-19, 35

Rice v. Glad Hands, Inc., 750 F.2d 434 (5th Cir. 1985) ............................ 39

R. J. D'Hemecourt Petroleum Inc. v. McNamara, 444 So.2d 600 (La. 1983) ............. 39

Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) ....... 20

State v. Adams, 355 So.2d 917 (La. 1978) .......................................... 21

State v. Aguillard, 357 So.2d 535 (La. 1978) ...................................... 22

State v. Barber, 617 So.2d 974 (La. App. 4 Cir. 1993) .......................... 37-38

State v. Blanton, 400 So.2d 661 (La. 1981) ...................................... 7, 15

State v. Blasio, 720 So.2d 749 (La. App. 4 Cir. 1998) ............................. 12

State v. Bourgeois, 609 So.2d 1003, 1004 (La. App. 5 Cir. 1992) ................... 21

State v. Caldwell, 504 So.2d 853, 856 (La. 1987) ................................. 10

iii

State v. Chopin, 372 So.2d 1222 (La. 1979)...........................................................11, 23

State v. Constantine, 364 So.2d 1011 (La. 1978).........................................................35

State v. DeHart, 445 So.2d 419 (La. 1984)..................................................................40

State v. Dyer, 794 So.2d 1 (La.App. 5 Cir. 2001)........................................................29

State v. Everidge, 702 So.2d 680 (La. 1997)...............................................................38

State v. Fabacher, 362 So.2d 555 (La. 1978)...............................................................39

State v. Fallon, 290 So.2d 273 (La. 1974)....................................................................39

State v. Finklea, 313 So.2d 224, 225-26 (La. 1975).....................................................26

State v. Franklin, 353 So.2d 1315 (La. 1978)............................................................8, 21

State v. Godeaux, 378 So.2d 941 (La. 1980)................................................................23

State v. Jackson, 625 So.2d 146 (La. 1993).................................................................33

State v. Key, 375 So.2d 1354 (La. 1979).................................................................15, 22

State v. Mareno, 619 So.2d 62 (La. 1993)...................................................................20

State v. Marks, 337 So.2d 1177 (La. 1976)..................................................................21

State v. Matthews, 366 So.2d 1348 (La. 1978).................................................7, 10, 14, 26

State v. Owens, 565 So.2d 1062 (La.App. 5 Cir. 1990)..................................................9

State v. Parker, 622 So.2d 791 (La.App. 4 Cir. 1993)..............................................23, 27

State v. Paster, 373 So.2d 170 (La. 1979)....................................................................24

State v. Poines, 376 So.2d 133 (La. 1979)...................................................................26

State v. Pounds, 359 So.2d 150 (La. 1978)..................................................................38

State v. Prieur, 277 So.2d 126 (La. 1973)....................................................................34

State v. Raheem, 464 So.2d 293 (La. 1985)...........................................................7, 21, 23-24

State v. Randolph, 337 So.2d 498, 500 (La. 1976).........................................................8

State v. Ratcliff, 416 So.2d 528 (La. 1982)..................................................................31

State v. Rey, 351 So.2d 489 (La. 1977)...................................................................15, 20

State v. Robinson, 386 So.2d 1374 (La. 1980).............................................................29

State v. Ruffin, 448 So.2d 1274 (La. 1984)..................................................................23

State v. Short, 665 So.2d 1102 (La. 1992)...................................................................23

State v. Singleton, 923 So.2d 803 (La.App. 5 Cir. 2006)................................27

State v. Smith, 430 So.2d 31 (La. 1983)................................28

State v. Sullivan, 596 So.2d 177 (La. 1992)................................18

State v. Thompson, Sr., 894 So.2d 1268 (La.App. 2 Cir. 2005)................................9

State v. Thorton, 621 So.2d 173 (La.App. 4 Cir. 1993)................................23

State v. Walker, 836 So.2d 618 (La.App. 5 Cir. 2002)................................37

State v. Washington, 364 So.2d 958 (La. 1978)................................11, 14, 22

State v. Williams, 833 So.2d 497 (La.App. 5 Cir. 2002)................................18

State v. Zeno, 742 So.2d 699 (La.App. 5 Cir. 1999)................................17, 28

State of South Carolina v. Bailey, 289 U.S. 412, 53 S.Ct. 667, 77 L.Ed. 1292 (1933).....30

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984)................................18-19, 31, 33

Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)................................12, 14, 21

United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)...12

United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)................................36

U.S. v. Corona, 551 F.2d 1386 (5th Cir. 1977)................................37

U.S. v. Garza, 608 F.2d 659 (5th Cir. 1978)................................37

U.S. v. Glass, 741 F.2d 83 (5th Cir. 1984)................................13, 20

U.S. v. Herrera, 531 F.2d 788 (5th Cir. 1976)................................36

U.S. v. O'Keefe, 128 F.3d 885 (5th Cir. 1997)................................14

U.S. v. Restrepo-Granda, 575 F.2d 524 (5th Cir. 1978)................................36

U.S. v. Thomas, 489 F.2d 664 (5th Cir. 1973)................................15-17, 20

## OTHER:

32 Am. Crim. L. Rev., at 1023-1024................................16

Att.Gen.Op., No. 1938-40, p. 151-152................................11

## JURISDICTIONAL STATEMENT

Jurisdiction is vested in this Honorable Court pursuant to Article V, Section 5 of the Louisiana Constitution.

## ASSIGNMENTS OF ERROR

1.    The Trial Court erred by failing to suppress the seizure of Mr. Ayo, finding police "not" in close or hot pursuit of person to be arrested may enter another jurisdiction and forcibly stop and (investigate) any citizen on whim, violating Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

2.    Trial Court erred by precluding Defense from cross - examining arresting officer on relevant "material" issue(s) in violating Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

3.    Trial Court committed fundamental error by not exercising judicial authority stopping the prosecution's obvious use of known perjured testimony, and, from the record, Defense Counsel rendered ineffective assistance by not impeaching or objecting, condoning the same, fraud on court, violating Mr. Ayo's Sixth and Fourteenth Amendment Constitutional Right(s).

4.    Trial Court erred by failing to suppress the seizure of Mr. Ayo and alleged evidence, finding that police bare-face observation of construction worker possessing [un]concealed knife, which violates no law, had probable cause as "private citizen" to immediately arrest, violating Mr. Ayo's Fourth, Fifth and Fourteenth Amendment Constitutional Right(s).

5.    Trial Court erred by failing to suppress the seizure of alleged evidence, finding that construction worker's possession of [un]concealed knife, which violated no law, was seized incident to arrest, violating Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

6.    Trial Court erred by failing to suppress seizure of jacket in cab, not  in "plain view" and beyond control of  Mr. Ayo, violating Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

7.    Trial Court erred by failing to suppress one-on-one identification, finding it not suggestive or that a likelihood of misidentification occurred, violating  Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

8.    Trial Court erred by not continuing trial, and "not" addressing multiple ineffective assistance of counsel claim(s) in pretrial writ, violating Mr. Ayo's Sixth and Fourteenth Amendment Constitutional Right(s).

9.    Trial Court erred by failing to grant a mistrial when the State committed fundamental error and "perjury" by fraudulently informing jury that Mr. Ayo is wanted for a parole violation, when Mr. Ayo has (never) been on parole, violating his Sixth and Fourteenth Amendment Constitutional Right(s).

10.   Trial Court erred by admitting evidence agreed upon in pretrial not to introduce, violating Mr. Ayo's Sixth and Fourteenth Amendment Constitutional Right(s) to a fair trial.

11.   Trial Court erred in not intervening and properly govern proceedings, stopping State's repeated improprieties denying Mr. Ayo's right to a fair and impartial trial, violating his Sixth and Fourteenth Amendment Constitutional Right(s).

1

## STATEMENT OF CASE

Defendant/Appellant, Glenn Ayo, was arrested January 7, 2007, and charged by way of Bill of Information, in Case No. 07-369, with armed robbery in violation of La.R.S. 14:64, and resisting arrest in violation of La.R.S. 14:108. (R. 23).

Defense counsel, Marquita Naquin, was appointed to represent the Defendant. However, on April 19, 2007, Ms. Naquin was dismissed because of a "non"-existing conflict of interest. Thereafter, Evans Schmidt was appointed to represent Mr. Ayo.

Counsel filed a Motion for Preliminary Examination and Motion to Suppress. (R. 9). On June 27, 2007, the Defendant supplemented the filing(s) pro se, to-wit: Petition for Writ of Habeas Corpus / Alternative Motion to Suppress. (Supp.R. 17-61). A motion hearing was held on August 16, 2007, disregarding pro se motion pending. (R. 76). Mr. Ayo filed a Petition for Writ of Mandamus into this Court which was issued by the Court on October 31, 2007, under Docket No. 07-K-871. (Supp.R. 13-16; R. 45). On November 9, 2007, the trial court conducted a separate hearing, denying relief on November 15, 2007. (R. 131, 145).

A jury trial was held November 27 & 28, 2007, and Defendant was found guilty as charged. (R. 148-383). A Motion for New Trial was filed and denied on December 5, 2007. Mr. Ayo was then sentenced to 87 years. (R. 389-403). The state filed notice of its intent to seek multiple bill enhancement (R. 22b). However, the state dismissed the bill on February 28, 2008. (R. 409-410). The instant appeal follows. (R. 70).

## STATEMENT OF FACTS

Mr. Baptiste DeBroy testified that he had gone to a Mardi Gras warehouse with his wife when a man approached from behind and put a knife to his throat, demanding money. The robber and he were face-to-face, within one foot, and he got a good look at him. (R. 80-83, 264-268).

Mr. DeBroy gave the perpetrator $28.00 and the perpetrator fled on foot towards Jefferson Highway. Mr. DeBroy called 911, describing the robber as a white man, about 5'7", weighing 150 pounds, and wearing a dark blue or black (pullover) hooded

2

sweatshirt.  (R. 84, 269-272).

Lieutenant Detective Daniel Jewell, Jr., who grew up in the neighborhood and was off duty at the time, got involved in the investigation when his uncle gave him a very brief description.  He met with the victim, got a better description, and instructed him to call 911.  He specifically remembered Mr. DeBroy saying that *"He was a nice looking guy."* (R. 155-158).

After he made a couple of loops around the neighborhood to see if he saw the perpetrator, Detective Jewell downgraded the search to a Code-1.  The radio dispatcher informed that Deputy Simoneaux stopped a suspect on Jefferson Highway.

While in route, going down Cicero Street, he saw a white male wearing blue jeans and green tee shirt carrying a travel bag.  After Detective Jewell questioned the description of the man with fellow officers via radio, he learned that the white male wearing blue jeans and green tee shirt that he saw did not fit the description of the suspect and passed him up.  (R. 158-162).

When Mr. DeBroy did not identify the Mexican man stopped by Deputy Simoneaux, Detective Jewell headed back to Cicero Street where he viewed the guy in green shirt and jeans, but he wasn't there anymore.  He asked one of the construction workers where the guy that was standing there with the green shirt went?  And they said, "Yeah.  He got into a blue cab and headed that way".  And the direction he pointed would have been towards New Orleans. (R. 85, 163).

Deputy Paul Simoneaux controvertedly testified that while in route to investigate an armed robbery, Detective Jewell advised that he observed a suspect fitting the description get into a Service Cab and he had a knife protruding from his pocket.  He then heard Detective Jewell broadcast on the radio that he was trying to catch up wit the cab, but lost sight of it as they entered Orleans Parish. (R. 98-100, 235-237).

When Deputy Simoneaux got to the corner of Eagle St. and Claiborne Ave., in New Orleans, he observed a cab in the Spur Station.  At that point, *"he stopped and began to watch"*.  He observed the man hand the cab driver what he believed was money.

5

Then he pulled into the station and grabbed his arm.

Deputy Simoneaux observed what appeared to be an [un]concealed knife protruding from his back pocket. He placed Defendant in a compliance hold and got him to the hood of his patrol car. He kept telling the individual to "*Stop Struggling,*" but the individual was saying, "*Well, I don't understand. Why is this going on? What's happening?*" Deputy McCoy arrived and assisted handcuffing the individual. The investigatory stop was not in conjunction with the N.O.P.D. (R. 94, 100, 107, 176, 237-239).

Deputy George McCoy and Deputy Paul Simoneaux searched the individual's pockets for property. He had $21.00 crumpled up in his right hand. (R. 101, 239-240). The victim was in the front passenger seat of Deputy McCoy's patrol car for an investigatory one-on-one viewing to see if he could identify the suspect, and saw Mr. Ayo resisting the officer(s). Deputy Paul Simoneaux had him wrapped up over the hood of his car. The victim was an elderly man, and his eyesight not good. Mr. DeBroy asked to get closer and identified him as the perpetrator. Then, Mr. Ayo was placed under arrest. (R. 114-116, 203-205, 207).

Nurse Practitioner, Susan Lee, of the Jefferson Parish Correctional Center, weighed the Defendant and he was 212 pounds the day of trial. (R. 303).

The Appellant, Glenn Ayo, took the stand in his own defense due to witness subpoena problems. (R. 336-337). He testified that he is 44 – not 30 years old, and was 240 pounds the day of arrest – not slim or 150 pounds, with obvious cuts, scabs and bruising about his face – certainly not the "*Good Looking Man*" Mr. DeBroy observed face-to-face in robbery. (R. 82-83, 91, 158, 284-285). Mr. Ayo was on his way to work, with a broken knife [tool] to strip copper wire in New Orleans when stopped by Jefferson Parish Officials.

Mr. Ayo testified and introduced into evidence a receipt demonstrating that he received a $300.00 Western Union (less) than 24 hours before arrest. He had no motive to rob victim. The case is one of mistaken identity. (R. 340-343, 355-356, 365).

4

*person to be arrested*) to pursue a suspect across parish lines.   See, e.g., State v. Thompson, Sr., 894 So.2d 1268, 1272 (La.App. 2 Cir. 2005) (The gang was spotted at an apartment complex loading the stolen money and a large cache of guns into a minivan. The Shreveport Police spotted and began trailing a green van matching the alert.  As they entered Bossier Parish, the officer pulled over the van.); State v. Owens 565 So.2d 1062, 1063 (La App. 5 Cir. 1990)(Gretna Police activated emergency lights and gave chase. The vehicle eventually was stopped in Harvey, Louisiana.).

In the case sub judice, no Jefferson Parish Sheriff's Deputy *"pursued"* Mr. Ayo or gave chase across the parish line.  In fact, Deputy Simoneaux further testified that (*he stopped and began to watch*).  This conclusively demonstrates that Jefferson Parish Sheriff's Deputies were (not) in hot pursuit of Mr. Ayo, "to be arrested . . ."  The requisite to following a suspect across parish lines to make an arrest. La.C.Cr.P. Art. 213 (3) & (4).

In other words, the Jefferson Parish Sheriff's Deputies were not in *hot pursuit* of this cab to immediately *arrest* its occupant(s), but "watch[ed]" and conducted an (investigation) out of his lawful jurisdiction.  Such an exploration for evidence must be performed by, or in conjunction with, the New Orleans Police Department (NOPD).  But Detective Jewell insubordinately broadcast to "slow NOPD down."  In fact, the record is devoid of officers from NOPD ever being on the scene.  (See State's Exhibit – 3).  Thus, in light of the fact Jefferson Parish Officials are without statutory authority to *"watch"* individuals and conduct independent (investigations) in another jurisdiction, the initial investigatory stop in Orleans Parish was illegal.

3.   *Denial of due process to cross-examine State's witness on "material" issue(s).*

## ASSIGNMENT OF ERROR NO. 2

Trial Court abused judicial discretion by precluding Defense from cross-examining arresting officer on relevant "material" issue(s), in violating Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

## ARGUMENT IN SUPPORT

On motion for preliminary examination (probable cause hearing), and on motion to suppress (admissibility of evidence at trail); hearing(s) on material issues relevant to Mr.

Ayo's liberty and fundamental fair trial. The Trial Court abused its judicial discretion and committed fundamental error, over objection, precluding Defense from cross-examining Deputy Simoneaux regarding:

      1.    The lawfulness of his jurisdiction under color of State;

      2.    His lawful authority/commission to conduct "investigation(s)" in Orleans Parish;

      3.    And, the lawfulness of Mr. Ayo's detention and arrest.
      (R. 106)

When the lawfulness of jurisdiction, the lawfulness of investigatory stop, and the lawfulness of Mr. Ayo's arrest and evidence seized were the three (3) primary issue(s) at bar. (R. 9, 104-107, 131-146).

The rule(s) of evidence are clear. Defense Counsel inherently vest a due process right to cross-examine key prosecution witnesses on relevant issue(s). Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); La.C.E. Art. 611(B). Mr. Ayo was entitled to cross-examine about events before, during, and after his "illegal" arrest, and erroneously excluding State witness testimony regarding those circumstances effectively prevented Mr. Ayo from presenting his defense, thereby violating substantial constitutional right(s) of Defendant. State v. Caldwell, 504 So.2d 853, 856 (La. 1987).

Here, the testimony was relevant to the crucial issue(s) of: (1) Whether officials were in hot pursuit into another jurisdiction to arrest Mr. Ayo; (2) Whether officials had lawful authority to conduct investigatory stops in Orleans Parish; and (3) Whether Mr. Ayo's detention and alleged evidence was lawfully seized.

The Trial Court's denial ultimately resulted in an illegal stop and arrest proceeding to trial, that otherwise would have resulted in the issuance of the writ and discharge of Mr. Ayo. Or, even had the writ been denied, "all" alleged incriminating evidence seized from the "illegal" stop would have been suppressed (work knife, $21.00, and zip-up windbreaker) as fruits of a poisonous tree. Matthews, supra. Thus the State would not have carried the erroneous burden of proof, as in this case, convicting an innocent construction worker, and jury would have returned a not guilty verdict.

4.    *Lawfulness of private "citizen" executing investigatory stop(s).*

Assuming arguendo, that Deputy Simoneaux was acting as a private citizen when [he] arrested Mr. Ayo in Orleans Parish. (R. 107). State v. Chopin, 372 So.2d 1222, 1224-1225 (La. 1979) (police officers did not have right to make investigatory stop of person walking in a well-lit, well-traveled area).

Deputy Simoneaux concedes (not) arresting Mr. Ayo immediately upon first encounter, such as that of a hot pursuit. But testified that "He stopped and began to watch." (R. 237). In other words, he (investigated). Then after detaining Mr. Ayo,

> "[He] notified Deputy McCoy to bring the victim to identify the subject that
> I stopped to see if this could be the perpetrator." (emphasis added).
> (R. 256).

Unequivocally, this officer conducted an (investigatory stop), because Mr. Ayo admittedly was not arrested until "after" the victim viewed the suspect. (R. 116, 207).

Accepting the State's argument as true, that Deputy Simoneaux was acting as a private individual making a citizen(s) arrest. (R. 107). Mr. Ayo contends, the admission of both officers conclusively demonstrate this was no arrest in hot pursuit, but an "investigatory stop" out of their jurisdiction. And Louisiana jurisprudence provides no such authority authorizing [private citizens with a hunch, to pursue mere suspects into another parish to conduct *investigatory stops*]. The law is clear, the officers must be "in close pursuit of person to be arrested . . ." La. C.Cr.P. Art. 213 (3) & (4).; Att.Gen.Op., No. 1938-40, p. 151-152. (emphasis added). This investigatory stop by a private citizen was illegal. State v. Washington, 364 So.2d 958, 960 (La. 1978).

5.    *Lawfulness of stop based solely on race or gender.*[4]

In a light most favorable to the State, the prosecution entered dispatch transcripts into evidence, demonstrating that Detective Jewell broadcast he merely observed:

> A white male with green shirt and blue jeans [several blocks away from
> robbery]
> (R. 152-154; State's Exhibit - 3).

In light of the fact (no green tee shirt nor blue jeans) were part of initial description, its

---

4    Ground Two of pro se Writ of Habeas Corpus / Motion to Suppress. (Supp. R. 17-61, R. 16, 131-146)

evident Deputy Simoneaux relied on the (only) remaining factor to justify stop in Orleans Parish.   Mr. Ayo's apparent Anglo "white/male" ancestry.   Deputy McCoy uncontrovertedly testified that they stopped the other person

> "Because the description said white male, and Hispanics are traditionally considered white males."
> (R. 213).

The United States Supreme Court held that race or gender alone form no reasonable basis for stopping and detaining citizens in a public place.  United States v. Brignoni-Ponce, 422 U.S. 873, 885-886, 95 S.Ct. 2574, 2582-2583, 45 L.Ed.2d 607 (1975).  The Fourth Amendment did not allow stops where race furnished the only ground for suspicion.  State v. Blasio, 720 So.2d 749, 756 (La.App. 4 Cir. 1998).

Here, Jefferson Parish Official had no reasonable cause for suspecting that Mr. Ayo committed a crime.  He did not match the description nor profile, and can point to the only vague fact that a (white male) entered a cab several blocks from the robbery and went *'that way"* to justify the stop in Orleans Parish.  (R. 162).  Thus, the investigatory stop based solely on the Defendant's race and/or gender was illegal and the unlawful seizure of his person and evidence that followed must be suppressed.

6.  *Lawfulness of forcible Terry stop.[5]*

The U.S. Supreme Court defined reasonable suspicion as "*specific and articulable facts*" which, taken together with rational inferences from those facts, reasonably warrant that intrusion.  See e.g.  Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (These men paced alternately along an identical route, pausing to stare in the same store window roughly 24 times, where each completion of this route was followed immediately by a conference between the two men on the corner).  Id. at 23.

In essence, the question here is whether, based on the totality of the circumstances, Deputy Simoneaux had a "particularized and objective basis" for suspecting that Mr. Ayo committed a crime.

5   Ground Three of pro se Writ of Habeas Corpus / Motion to Suppress  (Supp R. 17-61, R. 16, 131-146).

The radio dispatcher broadcast to all units a B.O.L.O., be on the look-out for:

> A white male, 150 lbs., black hair, wearing a blue or black (pullover) hooded sweatshirt.
> (See Exhibit – A)

When Deputy Simoneaux forcibly detained and subjected Mr. Ayo to a search by taking hold of him, Mr. Ayo was "*seized*" for purposes of the Fourth Amendment. Id. At 19. The "specific and articulable facts" the officer had were:

> 1. A fellow officer broadcast that he merely observed a white male [several blocks away from robbery];
>
> 2. He did not match the clothing description, wearing a lime-green tee shirt and carrying a travel bag;
>
> 3. He did not match the profile, as Mr. Ayo was 14 years older, "90" pounds heavier (240 lbs.), with very notable cuts and bruising about his face (not the good looking man to "B.O.L.O." - be on the Look-out for);
>
> 4. Mr. Ayo was in another parish;
>
> 5. And lawfully paying cab driver when observed the second time. (R. 173-174, 237, 283-286).

Neither singularly nor together, did these facts afford Deputy Simoneaux with a particularized and objective basis for reasonably suspecting Mr. Ayo of committing a crime. State v. Key, 375 So.2d 1354, 1358 (La. 1979).

The United States Fifth Circuit in U.S. v. Glass, 741 F.2d 83, 85-86 (5th Cir. 1984) reasoned that these same circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. The United States Supreme Court has also pointed out that entirely innocent behavior may on occasion justify the suspicion that criminal activity is afoot.

But such an occasion is not presented by this case. "After" the stop, when Mr. Ayo's [un]concealed work knife was revealed (which violates no Louisiana law); it cannot be the catalyst that converts Mr. Ayo's otherwise innocent activity into reasonable suspicion for the initial stop. Id.

Here the officers perception about Mr. Ayo's activity amounted to "*nothing more*

*substantial than an inarticulated hunch."* A result the United States Supreme court has consistently refused to sanction. Terry, 392 U.S. at 22. And the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging *"lawless police conduct."* Terry, 392 U.S. At 12; State v. Matthews, 366 So.2d 1348, 1352 (La. 1978); Washington, supra.

Thus, the illegal seizure of Mr. Ayo's person must be suppressed, the writ issued and Defendant discharged, or, in the alternative, suppress Mr. Ayo's lawful work knife, his justified U.S. Currency; the distinguishably different (zip-up) windbreaker; and suppress the suggestive one-on-one show-up [mis]identification of Mr. Ayo for a new, fair trial to be conducted.

7.   *Abuse of judicial discretion – allowing intentional use of "material" perjury of fraudulent probable cause to justify alleged hot pursuit.*

### ASSIGNMENT OF ERROR NO. 3

Trial Court committed fundamental error by not exercising judicial authority stopping the prosecution's obvious use of known perjured testimony; and, from the record, Defense Counsel rendered ineffective assistance by not impeaching or objecting, condoning the same; fraud on court violating Mr. Ayo's Sixth and Fourteenth Amendment Constitutional Right(s).

### ARGUMENT IN SUPPORT

#### Claim One:

Criminal conviction(s) procured by use of testimony known by prosecuting authorities to be perjured, and knowingly used in order to procure conviction where Mr. Ayo's life or liberty depends, violates due process of law to a fair trial. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false, (2) the prosecution knew they were false, and (3) the statements were material. U.S. v. O'Keefe, 128 F.3d 885, 893-94 (5th Cir. 1997).

In the case *sub judice*, in satisfying the three-prong test: Deputy Simoneaux controvertedly testified that Detective Jewell advised on the radio that a suspect got into a Service Cab and he had a knife protruding from his pocket. He was trying to catch up

with the cab but lost sight of the vehicle as we entered the Orleans Parish line.  (R. 98-100; 235-237).

In showing testimony false: (1) Detective Jewell testified that he observed a white male several blocks away from robbery, but didn't know if this was the description and he drove off. He didn't see the cab nor the guy get into cab. But when he returned to area, construction workers said the person got in a cab and went "that way."  (R. 162-164; 173-174).

In showing prosecutor knew it false: (2) the State introduced both the dispatch transcripts (R. 153; State's Exhibit – 3), and probable cause affidavit into evidence (R. 244, 306; State's Exhibit – 19), knowing there was "no" such broadcast by Detective Jewell chasing Mr. Ayo in hot pursuit of the cab into Orleans Parish.  In the case of *"probable cause"* for issuance of a warrant, see e.g. State v. Rey, 351 So.2d 489, 491-492 (La. 1977) (citing U.S. v. Thomas, 489 F.2d 664, 667-668 (5th Cir. 1973)) (intentional misrepresentation constitute fraud upon the court and impermissible overreaching by the government designed to deceive the magistrate).

In showing statements were material: (3) the State intentionally procured this false testimony of an erroneous *"hot pursuit,"* because otherwise the knife, money, and windbreaker (all tangible evidence) would have been suppressed due to an illegal investigatory stop and unlawful arrest out of jurisdiction.  State v. Blanton, 400 So.2d 661, 663-664 (La. 1981).  Thus, the State could not carry burden of proof, and jury would have otherwise returned a not guilty verdict, absent all erroneous demonstrative evidence.

8.    *Abuse of judicial discretion – allowing intentional use of "material" perjury of fraudulent perpetrator.*

Claim Two:

In satisfying the three-prong test of Napue, supra, Detective Jewell first testified that his uncle gave him a very brief description of the suspect. So, he immediately went and met with the victim and got a better description. Detective Jewell next instructed Mr. DeBroy to call 911 while he canvassed the area.  (R. 157-158).

15

In showing testimony false: (1) Then Detective Jewell controvertedly testified that on the 911 tape, he informed the dispatcher "[He] thought [he] saw a knife in [Mr. Ayo's] back pocket." (R. 186-187). While it is interesting enough that Detective Jewell was not present when the (victim) called 911 (R. 774). Most astonishing is the fact that Mr. Ayo was first observed by Detective Jewell over sixteen (16) minutes "after" the 911 call was placed -- not before the initial report – undoubtedly known perjurous testimony by this Detective. (R. 161-163; State's Exhibit – 3).

In showing prosecutor knew it false:  (2) The prosecutor met with Detective Jewell in her office, played and listened to the 911 tape, and further introduced the 911 transcripts into evidence (R. 153, 186-187; State's Exhibit – 4), knowing there was "no" such conversation of observing Mr. Ayo with a knife between the 911 operator and Detective Jewell. State's Exhibit – 4 is devoid of a single transmission by Detective Jewell – a textbook case of the State in collusion with witness[es] to offer known perjurous testimony. Thomas, supra.

In showing statements were material:  (3) The State procured this fraudulent (eyewitness) to prejudice the jury's mind that this was no work knife, placing Mr. Ayo near the scene by an "erroneous" but credible eyewitness (Lieutenant Detective) with the same type of weapon utilized by perpetrator to commit crime – undoubtedly "material" fraud on court.

Psychological studies on expert testimony surrounding juror misperception on eyewitness identification, conclusively demonstrate that "seventy-two (72) percent of jurors voted for conviction" upon eyewitness identification. 32 Am. Crim. L. Rev. at 1023-1024. Otherwise, the State could not carry its burden of proof based on the truthful observation of Mr. Ayo's innocent everyday behavior; absent the erroneous portrayal that Mr. Ayo was observed near the scene with a weapon and committed the crime charged, seventy-two (72) percent of jury would have returned a "not" guilty verdict – material to the outcome of bias and fundamentally unfair trial.

16

9.    *Abuse of judicial discretion – allowing intentional use of known "material" perjured in-court identification.*

Claim Three:

Encompassed in proving the elements of an offense is the necessity of proving the identity of the Defendant as the perpetrator. State v. Zeno, 742 So.2d 699, 706 (La. App. 5 Cir. 1999), when the key issue in the case is identification, the State is required to negate any reasonable probability of [mis]identification in order to carry its burden of proof.

In satisfying the three-prong test of Napue, supra: Mr. DeBroy, the victim, could "not" identify Mr. Ayo as the perpetrator just eight (8) months after the robbery at the suppression hearing. (R. 96). Yet, eleven (11) months later at trial, November 28, 2007, the State procured a suggestive in-court identification by showing Mr. DeBroy Mr. Ayo's booking photo (prior) to the identification procedure. (R. 279; State's Exhibit – 13).

The record, however, further conclusively demonstrates Mr. Ayo abrupted the Trial Court's attention, in objection, after the Judge ordered "*clear the hall to return Defendant from jail.*" When the Assistant District Attorney, Shannon Swain and victim were strategically positioned by jail door to procure a known false identification of Mr. Ayo. Then, all of a sudden he is "sure," falsely identifying Mr. Ayo, an innocent construction worker in court. (R. 279, 296; See also Defense Trial Notes, Exhibit – B).

In showing testimony false: (1) the fact that Mr. DeBroy could "not" previously make an in-court identification until after the illegal suggestive viewing of first the booking photo, and then again at the jail door, merely corroborating Mr. Ayo's objection of suggestive viewing and thereafter known perjurous testimony. Thomas, supra.

In showing prosecutor knew it false: (2) the prosecutor boldly made a point to capitalize on the victim not being able to identify Mr. Ayo at suppression hearing, but he could today, merely demonstrating the State knew the identification testimony was in fact the product of her falsehood. (R. 280-281).

In showing statements were material: (3) psychological studies on expert

17

testimony surrounding juror misperception on eyewitness identification, demonstrate that "seventy-two (72) percent of jurors voted for conviction" upon eyewitness in-court identification. 32 Am Crim L Rev, at 1023-1024. The State knew that "positive identification by only one witness is sufficient to support a conviction." State v. Williams, 833 So.2d 497, 503 (La. App. 5 Cir. 2002). And intentionally procuring this false testimony and "material" fraud on court, knowing the erroneous in-court identification would assure conviction. Otherwise, the State could not carry burden of proof. Thus, Mr. Ayo received a fundamentally unfair trial, and seventy-two (72) percent of the jury would have otherwise returned a "not" guilty verdict, absent the fraudulent identification.

10.   Ineffective assistance of counsel.

When a claim of ineffective assistance of counsel is raised on direct appeal, State v. Sullivan, 596 So.2d 177, 183 (La. 1992), a narrow exception has been recognized when the record discloses evidence needed to decide the issue. That claim is evaluated under the two-prong standard established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed.2d 674 (1984).

In establishing the first-prong of Strickland, Mr. Ayo contends the (record) clearly demonstrates counsel's deficient performance after hearing the obvious perjury, "not" impeaching nor objecting, not moving for mistrial nor a curative admonishment of jury. Nero v. Blackburn, 597 F.2d 991, 994 (5th Cir. 1979). Counsel was aware of the dispatch and 911 transcripts "before" trial, moreover, aware of prosecutor and victim at jail door, over objection. (R. 296). Yet took absolutely no steps to challenge the State's perjurous demonstrative evidence, certainly falling below and objective standard of reasonable professional norms. (See Exhibit – B).

In establishing the second-prong of Strickland, Mr. Ayo contends the clear exhibition of deficient (lack of) performance, of not subjecting the State's case to meaningful adversarial testing, allowing "all" incriminating looking evidence of work knife, justifiable U.S. Currency, and a different zip-up weather-proof windbreaker (not a

pullover sweatshirt) all go to jury; coupled with the known perjurous testimony and suggestive, falsely fabricated in-court identification, undoubtedly prejudiced Mr. Ayo with a fundamentally unfair trial and miscarriage of justice by the conviction of an innocent construction worker. Thus, satisfying both prongs of Strickland, warranting a new trial with suppression of the unconstitutional identification. Nero, supra.

**11.**   *Lawfulness of arrest by private citizen.*[6]

### ASSIGNMENT OF ERROR NO. 4

Trial Court erred by failing to suppress the seizure of Mr. Ayo and alleged evidence, finding that police bald-face observation of construction worker possessing [un]concealed knife, which violates no law, had probable cause as "private citizen" to immediately arrest, violating Mr. Ayo's Fourth, Fifth and Fourteenth Amendment Constitutional Right(s).

### ARGUMENT IN SUPPORT

Despite Mr. Ayo "not" matching the description nor profile of perpetrator, coupled with innocent everyday behavior of paying cab driver, Deputy Simoneaux immediately arrested Mr. Ayo because he possessed an [un]concealed work knife, which violated "no" Louisiana law. (R. 162, 237).

The fact that Mr. Ayo was carrying a work knife in the city may have been slightly suspicious. Notwithstanding that when Mr. Ayo was encountered (arrested), he was in the 17th Ward of Orleans Parish (where Hurricane Katrina broke the 17th Street canal levee) – one of the hardest hit areas and most heavily under construction at the time.

Otherwise, the knife would have been suspicious, but standing alone, did not furnish probable cause to believe Mr. Ayo committed a crime in another parish warranting immediate arrest. (R. 315-316, 322-323). Interesting is the fact, Detective Jewall unequivocally testified that on this (Sunday) morning in question, construction "workers hanging a billboard" said the man with travel bag got into a cab. (R. 162, 173-174).

In a light most favorable to the State, under the totality of circumstances known to Deputy Simoneaux (before) he encountered Mr. Ayo in another jurisdiction, there did not exist sufficient facts to justify immediate arrest.

> A white male got into a cab and was headed towards New Orleans.
> (R. 162-163; State's Exhibit – 3).

6   Ground Four and Five of pro se Writ of Habeas Corpus / Motion to Suppress. (Supp. R. 17-51; R. 16, 171-146).

19

With the limited information that the officer knew up to that point, the officer did not have the requisite "probable cause" necessary to apply with Magistrate for an arrest warrant. Spinelli v. United States, 393 U.S. 410, 412-413, 89 S.Ct. 584, 587, 21 L.Ed.2d 637 (1969); State v. Rev, 351 So.2d 489, 491-492 (La. 1977)(citing U.S. v. Thomas, 489 F.2d 664, 667-668 (5th Cir. 1973)).

Nor did the observation of an [un]concealed work knife in heavily constructed area of city by itself furnish reasonable cause to immediately arrest.. "No" Magistrate would have found just case to issue an arrest warrant on the bare-face facts known to Deputy Simoneaux before the encounter:

> A white male got into a cab and was headed towards New Orleans.
> (State's Exhibit – 3).

Thus, the State can not reasonably argue he was acting as a private citizen when making the "illegal" arrest on much less than probable cause.

12. *When illegal stop(s) ripen into probable cause.*

The State's argument, that Deputy Simoneaux was acting as a private citizen in making Mr. Ayo's arrest in Orleans Parish, is seriously misplaced. The State can not now argue that an "illegal" investigatory stop out of jurisdiction ripened into probable cause to arrest when Deputy Simoneaux observed the knife in Mr. Ayo's pocket. (R. 145).

The same officer testified that Mr. Ayo did not attempt to enter store, not even with his work knife, but sent the cab driver in with money. (R. 237). Yet, the State knowingly offered more perjurous testimony that "[officials] are not expected to sit back and let him enter store with a knife" to fraudulently stop the suppression of "illegally" seized evidence - knowing Deputy Simoneaux did not say Mr. Ayo was going to enter store. (R. 144-145). Additionally, the State's position would unreasonably authorize the immediate arrest of nearly every construction worker entering a convenient store daily before and after work! See U.S. v. Glass, 741 F.2d 83, 85-86 (5th Cir. 1984).

But the State still misses the point, Mr. Ayo admittedly was not observed doing anything suspicious or criminal in nature. (R. 163, 182, 237). State v. Moreno, 619

So.2d 62, 65 (La. 1993). And the fact unknown construction workers said he got into a cab and went "that way," it's obvious Detective Jewell did not receive any more articulated information from a reliable trustworthy source warranting immediate arrest. (R. 162-163). Beck v. Ohio, 379 U.S. 89, 96-97, 85 S.Ct. 223, 228-229, 13 L.Ed.2d 142 (1964); State v. Raheem, 464 So.2d 293, 297 (La. 1985). Thus, under the totality of the circumstances, there was not enough information nor probable cause for Defendant's arrest.

13.   *Lawfulness of evidence seized.*

## ASSIGNMENT OF ERROR NO. 5

Trial Court erred by failing to suppress the seizure of alleged evidence, finding that construction worker's possession of [un]concealed knife, which violated no law, was seized incident to arrest, violating Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(n).

## ARGUMENT IN SUPPORT

In order for Jefferson Parish officials to justify a warrantless search as incident to an arrest, an arrest must have already occurred and the arrest itself must have been "*lawful.*" State v. Marks, 337 So.2d 1177, 1181 (La. 1976).

The State bears the burden of affirmatively showing that it was justified under one of narrow exceptions of search warrant requirements. State v. Adams, 355 So.2d 917, 919 (La. 1978); see e.g., State v. Franklin, 353 So.2d 1315, 1319 (La. 1978) (police in hot pursuit must have probable cause to arrest culprit before pursuing him). Here the initial stop nor arrest of Mr. Ayo was based on sufficient facts to justify the officers' belief that Mr. Ayo committed a crime. (R. 161-162, 237-239).

The fact that Mr. Ayo: (1) did not match any feature of description of perpetrator other that he is a "white male," (2) who traveled in a hired cab with a travel bag, (3) who was lawfully observed paying the cab driver, or (4) who lawfully possessed and [un]concealed work knife in area obviously under heavy construction, hardly could be considered indicative of criminal activity.[7] State v. Bourgeois, 609 So.2d 1003, 1004 (La. App. 5 Cir. 1992). Without any showing that officers had heard or seen anything else

---

7   And still under construction  two (2) year's after arrest.

to give them grounds to believe that Mr. Ayo had acted or was then acting unlawful, violated the Fourth and Fourteenth Amendments, and knife seized from his person during ensuing search was inadmissible. Beck v. Ohio, 379 U.S. 89, 96-97, 85 S.Ct. 223, 228-229, 13 L.Ed.2d 142 (1964); State v. Washington, 364 So.2d 958, 960 (La. 1978).

The rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging "*lawless police misconduct*." Terry, supra, 392 U.S. At 12.

And experience has taught that it is the only effective deterrent to police misconduct. See e.g., State v. Aguillard, 357 So.2d 535, 538 (La. 1978)(Police officer who apprehended defendant, patted him down and seized cocaine, and then placed him under arrest did not lawfully arrest defendant prior to search, and therefore the warrantless search was unlawful and refusal to suppress evidence was error). State v. Key, 375 So.2d 1354, 1355 (La. 1979).

Thus, the alleged evidence (work knife) "not" identified by victim as weapon used in robbery (R. 278), SHOULD have been suppressed and certainly not admitted as "material" evidence in trial.

### 14. *Search incident to unlawful arrest.*[5]

Now, turning to the seizure of U.S. Currency. The report(s) and testimony of Jefferson Parish officials is riddled with so many different versions of the event, one can not merely deem it inconsistent testimony, but obvious perjury and material fraud on court(s). Because starting with Deputy McCoy, who testified that $21.00 was seized when it fell to the ground. (R. 219). Deputy Simoneaux testified that it was forced from Mr. Ayo's hand, but concedes searching his pockets (R. 191, 240, 258), where Mr. Ayo contends his money was recovered from the search of his inner pockets. (R. 323).

The victim reported that the perpetrator made off with $28.00. (R. 87) Defendant was stopped just minutes after the robbery and found in possession of $21.00, "not" denomination stolen. (R. 220). Moreover, at trial, Mr. Ayo uncontrovertedly submitted

---

5   Ground Six of pro se Motion to Suppress. (Supp. E. 17-61, E. 16, 131-140)

into evidence a $300.00 Western Union Receipt from "less" than 24 hours of this robbery, clearly justifying his resources. (R. 319).

The State's position ignores the legality of the initial stop, lawfulness of arrest, and failed to carry the burden of affirmatively proving that the currency seized derived from the robbery. (R. 87, 258, 319). Raheem, supra; State v. Ruffin, 448 So.2d 1274, 1279 (La. 1984) (search of defendant, subsequent to the unlawful arrest, could not be justified as a search incident to a lawful arrest). Thus, the $21.00 should have been suppressed.

15.   *Lawful seizure of abandoned property.*

Deputy McCoy testified that the money fell out of his hand to the ground. (R. 219). State v. Chopin, 372 So.2d 1222, 1224 (La. 1979), officers did not have right to make initial stop. Thus, money abandoned by Mr. Ayo as a result thereof could not have been legally seized.

16.   *Search exceeded pat down for weapons.[9]*

Mr. Ayo contends that Deputy Simoneaux and Deputy McCoy both ridiculously testified that Mr. Ayo was still holding the money in his hand at least 35 minutes after robbery. (R. 153, 219, 258; State's Exhibit – 3).[10] Obviously the currency was recovered from search of Mr. Ayo's inner pockets, exceeding scope of Terry pat-down for weapons. (R. 323). State v. Thorton, 621 So.2d 173, 176 (La. App. 4 Cir. 1993).

17.   *Illegal stop and search may not ripen into probable cause.[11]*

The currency in and of itself is not unlawful nor contraband. State v. Parker, 622 So.2d 791, 794-795 (La. App. 4 Cir. 1993). Nor its incriminating character immediately apparent, since it did not match denomination stolen to furnish/ripen into probable cause. State v. Short, 665 So.2d 1102 (La. 1992).

18.   *Lawfulness of chain of custody as to material evidence.[12]*

Jefferson Parish Sheriff's Office record(s) conclusively demonstrate that Deputy McCoy and Deputy Simoneaux materialized at jail the day (after) arrest, collected "any"

9   Ground Eleven of pro se Motion to Suppress. (Supp. R. 17-61; R. 76, 131-145).
10  Moot perjury and material fraud up on court.
11  Ground Twelve of pro se Motion to Suppress. (Supp. R. 17-61; R. 76, 131-145). Distinguishable from legal remedi[l]y addressing Brite.
12  Ground Thirteen of pro se Motion to Suppress. (Supp. R. 17-61; R. 76, 131-145).

23

$21.00 from property officer, and submitted the same as material evidence at trial. (R. 219-220). But when Mr. Ayo challenged the sufficiency of the evidence, not identified visually nor through proper chain of custody, the State declined to argue and carry its burden of proof that this evidence derived from robbery. (R. 142-143, 145). State v. Godeaux, 378 So.2d 941, 944 (La. 1980); State v. Pastor, 373 So.2d 170, 177 (La. 1979). Thus, when the State failed to establish the identity of money seized by chain of custody, the Trial Court committed fundamental error not suppressing and admitting the demonstrative material evidence at trial, seized in violation of Mr. Ayo's Fourth and Fourteenth Amendment Constitutional Right(s).

39.   *Lawfulness of search beyond immediate control of Mr. Ayo.* [3]

### ASSIGNMENT OF ERROR NO. 6
Trial Court erred by failing to suppress seizure of zip-up windbreaker found
in cab, not in "plain view" and beyond control of Defendant arrested in
front store, violating Mr. Ayo's Fourth and Fourteenth Amendment
Constitutional Right(s).

### ARGUMENT IN SUPPORT

Deputy Simoneaux testified that he grabbed hold of Mr. Ayo, removed the knife from his back pocket and place it on ice machine in front of store. (R. 100, 204). He was not present, but Deputy McCoy advised him later that he found a jacket "inside" a travel bag located in back seat of cab. (R. 110). The Supreme Court held in Coolidge v. New Hampshire, 403 U.S. 553, 456, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971), following arrest inside house, search of his vehicle outside could not be justified as incident to the arrest. Chimel v. California, 395 U.S. 752, 766-767, 89 S.Ct. 2034, 2041-2042, 23 L.Ed.2d 685 (1969); search of defendant's entire house was unreasonable as extending beyond defendant's person and area in his immediate control from which he might have obtained either a weapon or something that could have been used as evidence against him. State v. Raheem, 464 So.2d 293, 295-296 (La. 1985). Thus, the jacket seized from inside Mr. Ayo's travel bag in cab should have been suppressed. (R. 110).

---

13. Ground Seven of pro se Motion to Suppress. (Supp. R. 17-61, R. 16, 133-146).

20.   *Investigative exploratory search out of jurisdiction.*[14]

Deputy Simoneaux observed a blue cab at the Spur Station in New Orleans. "He stopped and began to watch" [investigated]. (R. 237). Then he detained Mr. Ayo (R. 100, 258) and Deputy McCoy searched him and the cab for additional property (R. 116, 240). Then, <u>after</u> the victim identified Mr. Ayo, Deputy Simoneaux placed him under arrest. (R. 207, 242).

The record is clear that officials immediately detained Mr. Ayo, then went on an illegal exploratory search out of their jurisdiction. After discovering enough alleged evidence, what now appeared to amount to probable cause, they arrested Mr. Ayo. Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961).

But in order for Jefferson Parish officials to justify a search as incident to an arrest, an arrest must have already occurred and the arrest itself must have been *"lawful."* Unlike the illegal investigatory stop of Mr. Ayo, after the unlawful search and identification, then he was arrested. (R. 207, 242). Thus, the windbreaker located inside the travel bag in cab should have been suppressed.

21.   *Search of closed travel bag justified under "plain view" doctrine.*[15]

Detective Jewell testified he observed a white male wearing a green tee shirt and carrying a travel bag over his shoulder. (R. 158, 162, 173). His broadcast makes "no" mention of observing an exposed jacket fitting the description. (State's Exhibit – 3). Detective Jewell further testified that the blue windbreaker was *"removed (from) the gym bag found in the back of cab"*. (R. 180-181). The victim unequivocally corroborates this fact, testifying that *"they walked over to a bag and they (pulled out) a blue jacket."* (R. 277). (emphasis added). Yet, Deputy McCoy seen fit to commit perjury and "material" fraud on court by testifying that the cab driver said he has a jacket "that he put (in) the bag." (R. 116; State's Exhibit – 16). Then at trial contradicted his own testimony from suppression hearing testifying that the jacket "was laying (on top) the bag. [He] didn't have to go into the bag at all." (R. 123, 218) (emphasis added).[16]

14. Ground #[?] of pro se Motion to Suppress. (Supp. R. 17-61; R. 16, 131-146)
15. Ground #[?] of pro se Motion to Suppress. (Supp. R. 17-61; R. 16, 131-146)
16. Noteworthy. This same officer, Deputy McCoy, contradictorily testified that the money was also in Mr. Ayo's

25

In State v. Pomes, 376 So.2d 133, 135 (La. 1979), the State Supreme Court set fourth a three (3) prong requisite before evidence may be lawfully seized as being in "plain view."

> 1.    That there be a prior justification for police intrusion into a protected area.
>
> 2.    That the evidence be discovered inadvertently,
>
> 3.    And that it be immediately apparent, without close inspection, that the items are evidence or contraband.

In satisfying the first prong of the test, Mr. Ayo contends: Under the totality of the circumstances and information known to Jefferson Parish Officials, there was no reasonable cause nor hot pursuit "*of person to be arrested*" justifying the police intrusion into Mr. Ayo's protected area of privacy in another jurisdiction. State v. Matthews, 366 So.2d 1348, 1352 (La. 1978). Thus, the officers were not in a lawful position to search (conduct investigations) in Orleans Parish.

In satisfying the second prong of the test, Mr. Ayo contends: The cab driver's statement, State's Exhibit – 16, nor trial testimony makes "no" mention of observing Mr. Ayo with a jacket, let alone seen him put it "*in*" travel bag or that he informed police he wanted Mr. Ayo's property out of his cab. Thus, the contents of the travel bag was not discovered inadvertently, but through an illegal exploratory search of cab to locate the travel bag Detective Jewell observed in hope(s) it contained evidence. See e.g., State v. Finkles, 313 So.2d 224, 225-26 (La. 1975) (items which were not visible from outside the car were not in plain view, and thus not subject to warrantless seizure).

In satisfying the third prong of the test, Mr. Ayo contends: And not only was it a polyester zip-up windbreaker that Mr. Ayo possessed, not a cotton "*pullover*" sweatshirt as worn by perpetrator. (R. 181. See Exhibit – C).

Not one, but two (2) witnesses testified, a Lieutenant Detective and the victim that Deputy McCoy

"*removed from* . . . *pulled out*"

a blue jacket from "*inside*" the travel trailer bag. (R. 180-277). (emphasis added).

head 15 minutes later, then just fell to ground (R. 212). Everything was a textbook case, [conveniently] in "plain view"

26

Thus, it was "not" in plain view, nor immediate apparent, without close inspection,

that the zip-up windbreaker was only similar to evidence they were looking for. See e.g.,

State v. Parker, 622 So.2d 791, 794 (La.App. 4 Cir. 1993) (if its incriminating character

[is not] immediately apparent the plain-view doctrine cannot justify its seizure).

Therefore, the Trial Court committed fundamental error admitting incriminating

material evidence, "not" inadvertently discovered in plain view, into trial.

21.     *"One-on-one" show-up identification process unduly suggestive.*

### ASSIGNMENT OF ERROR NO. 7

Trial Court erred by failing to suppress one-on-one identification, finding it
was not suggestive or that a likelihood of misidentification occurred,
violating Mr. Ayo's Fourth, Sixth, and Fourteenth Amendment
Constitutional Right(s).

### ARGUMENT IN SUPPORT

In the case sub judice, this was simply not a non-suggestive procedure utilized.

Deputy Simoneaux, testified that the victim was in the passenger side of Deputy McCoy's

patrol car when they pulled in to the service station.

> His windshield would be facing directly at the suspect while [we] were
> wrestling with him on the front hood of car. After he was handcuffed, he
> stood up. He faced directly towards Deputy McCoy's Unit."
> (R. 109-110)

Mr. DeBroy, the victim, unequivocally testified that upon his viewing

> "[He] was thinking they were arresting someone for something."
> (R. 86, 289-290).

In challenging an identification procedure, the defendant must prove two things.

(1) He must prove that the identification itself was suggestive, and (2) that there was a

substantial likelihood of misidentification as a result of the procedure. Manson v.

Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Singleton, 923

So.2d 803 (La App. 5 Cir. 2006).

In satisfying the first prong of test, Mr. Ayo contends: (1) Under the totality of

circumstances in which the victim was transported to another parish to view a dramatic

exhibition of *lawless police misconduct*, instead of simply returning Mr. Ayo to the non-

hostile crime scene. The Trial Court undoubtedly erred finding such an unorthodox

27

viewing procedure "not" suggestive. (R. 290).

In satisfying the second prong of test, Mr. Ayo contends: (2) the victim concedes "[He] was thinking they were arresting somebody for something." (R. 86, 289-290). Coupled with the fact Mr. DeBroy sat attentively in police car listening to Mr. Ayo's criminal history. (R. 288).

The fact that Mr. Ayo was (14 years older, "90" pounds heavier (240 lbs.), husky, with very notable cuts and bruising about his face), unlike the 150 lbs., slim, "good looking" description of perpetrator Mr. DeBroy originally provided.  Moreover, the victim did not identify Mr. Ayo in court as the robber at suppression hearing. (R. 96, 288; State's Exhibit – 13).

In light of the magnitude of the victim's [in]accuracy from his initial description and [un]certainty at pre-trial hearings, the only logical conclusion is that Mr. DeBroy was mistaken and his decision making prejudiced by the police officers wrestling Mr. Ayo down, bent over the police vehicle and handcuffed in his presence.  Thus, as a direct result of the lawless police misconduct and unreasonable procedure utilized, there exists not just a substantial likelihood of, but there was a [mis]identification of an innocent construction worker. (R. 325-326).  Thus, the Trial Court should have suppressed the one-on-one show-up identification, and relied on the in-court identification at trial less than one (1) year after the incident.

22.    *Suggestive in-court identification.*

The victim, Mr. DeBroy did "not" identify Mr. Ayo as the perpetrator of the robbery just eight (8) months later at the suppression hearing of August 16, 2007.  When the key issue is the identity of the person who committed the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Smith, 430 So.2d 31 (La. 1983); State v. Zemo, 742 So.2d 699, 706 (La.App. 5 Cir. 1999).

So, at trial, the State first showed Mr. DeBroy a (single) picture of Mr. Ayo's Booking Photo prior to any attempt to procure a proper in-court identification procedure

28

with Defendant's obvious presence, achieving a suggestive identification by improperly implying:

> "Is this a picture of the person who robbed you?"
> (R. 279; State's Exhibit – 13).

Then all of a sudden (now) Mr. DeBroy identifies Mr. Ayo, an innocent construction worker on his way to work, after this material evidence was improperly introduced. In Bright v. State, 776 So.2d 1134, 1145 (La. 2000), the Louisiana Supreme Court stated that: An identification procedure is suggestive if it unduly focuses a witness's attention on the suspect. State v. Robinson, 386 So.2d 1374, 1377 (La. 1980), State v. Dyer, 794 So.2d 1, 8 (La. App. 5 Cir. 2001). But victim's identification of Defendant from "photo array" was not unduly suggestive. In this case, in which the prosecutor did not lay a proper foundation, improperly displaying a "single" photo of Mr. Ayo, was unduly suggestive by solely focusing witness' attention on Defendant.

23.  *Material fraud of in-court identification.*[17]

But the prosecutorial misconduct during identification process did not stop there. The record conclusively demonstrates Mr. Ayo abrupted the Trial Court's attention, in objection, after the Judge ordered

> "Clear the hall to return Defendant from jail."

Only to find the Assistant District Attorney and victim strategically positioned by jail door to procure a known false trial [mis]identification of Mr. Ayo as the perpetrator of a crime he is innocent of. (R. 296; Exhibit – B)

Thus, no amount of want can cure the fundamental due process violation(s), except that of a new unbiased and impartial trial be held, suppressing both the suggestive out-of-court and in-court identification from the first trial. State v. Robinson, 386 So.2d 1374 (La. 1908).

24.  *Unlawfully booking Mr. Ayo in parish other than arrest, absent proper extradition procedure.*[18]

Uncontroverted is the fact that Jefferson Parish officials arrested Mr. Ayo at the Spur gas station on the corner of Eagle St. and Claiborne Avenue, in Orleans Parish. (R.

17. Distinguishably by different from Assignment of Error No. 3, known use of perjured testimony.

18. Ground(s) Seventeen and Eighteen of prose Motion to Suppress (Supp. R. 17-61; E. 16, 131-146).

29

106-107, 242)  The Sheriff's Office record(s), however, conclusively demonstrate that Mr. Ayo was illegally abducted and transported to the jail located in Gretna, absent proper extradition procedure(s).  The Uniform Criminal Extradition Act, 18 U.S.C.A. § 3182, of this Title governs state procedures and embrace every offense known to the law, including misdemeanors.  Ex Parte Reggel, 114 U.S. 642, 5 S.Ct. 1148, 29 L.Ed.2d 250 (1885); Cougeris v. Sheahan, 11 F.3d 726, 728 (7ᵗʰ Cir. 1993).  And it was state court's duty in habeas corpus proceeding for release from custody to administer law prescribed by constitution, as constructed by the United States Supreme Court.  State of South Carolina v. Bailey, 289 U.S. 412, 417, 53 S.Ct. 667, 669, 77 L.Ed. 1292 (1933).

Louisiana law is clear, La.C.Cr.P. Art. 228(A) (2006), provides that "every peace officer making an arrest, or having an arrested person in his custody, promptly to conduct the person arrested to the nearest jail or police station and cause him to be booked."  Thus, the trial court committed fundamental error not issuing writ and relieving Mr. Ayo of bond obligation, prejudicing Defendant with unconstitutional incarceration in violation of Mr. Ayo's Fourth, Eighth, and Fourteenth Amendment Constitutional right(s).

25. *Ineffective assistance of counsel "contested" in pretrial motion.*[19]

## ASSIGNMENT OF ERROR NO. 8
Trial Court erred by "not" addressing multiple ineffective assistance of counsel claim(s) in pretrial writ, violating Mr. Ayo's Sixth and Fourteenth Amendment Constitutional Right(s).

## ARGUMENT IN SUPPORT

Claim One:

Mr. Ayo's letters to Defense Counsel over a seven (7) month period, informed,

> "[He] needs to speak with [attorney] or your investigator as soon as possible as [my] primary alibi witness 'Dave,' who I don't know's last name, is having landlord trouble and may move."

The letters are part of the record, attached to pro se brief as exhibits.  (Supp. R. 56-65; R. 131-146; See Exhibit – D).

---

[19] Ground's) Nineteen, Twenty, and Twenty-One of pro se Writ of [Habeas Corpus are consolidated into one (1) intersession for convenience of court.  (Supp. R. 17-51; R. 16, 131-146).

30

Claim Two:

Thereafter, before trial, Defense Counsel "again" neglected to perform his required duty, locating and securing the (only) other remaining Defense witness Theo Brickley.

In fact, the record makes clear that the State was even aware He was an alibi witness, ridiculing Defense how

> "[Mr. Brickley] just plead guilty less than a month ago and [Defense Counsel's] saying that he couldn't locate him. He's on probation . . . It's certainly part of the public record."
> (R. 336-337).

But counsel called "no" witnesses on defense entirely predicated on (alibi), a prima facie claim of ineffective assistance.

The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), developed a two-prong test with which to evaluate claims of ineffective assistance of counsel.

When the record is sufficient, the court may resolve this issue on direct appeal State v. Ratcliff, 416 So.2d 528 (La. 1982). In light of the fact these issue(s) were raised in pre-trial motion(s), proper venue rest in this court.

In satisfying the first prong of Strickland, Appellant contends; because Mr. Ayo relied entirely on an alibi defense and Defense Counsel attempted to present an alibi defense with "no" corroborating alibi witnesses constituted an inadequate pretrial investigation as Mr. Ayo's bare testimony left him without any effective defense. Code v. Montgomery, 799 F.2d 1481, 1484 (11th Cir. 1986). Thus, constituting deficient performance so serious that he was not functioning as the counsel guaranteed Mr. Ayo by professional norms of Sixth Amendment. Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985).

In satisfying the second-prong of Strickland, Mr. Ayo contends Theo Brickley and "Dave's" missing testimony was exculpatory, directly contradicting the State's chief witness. The victim testified that he was robbed about ten (10) minutes before placing 911 call at 9:21 a.m. [around 9:11 a.m.] by a good looking white man who fled on foot.

81

wearing a blue or black (pullover) sweatshirt. (R. 264: See State's Exhibit – 4).

Mr. Brickley would have corroborated Defendant's testimony that:

> "He picked-up Mr. Ayo in New Orleans, walking home at 9:05 a.m., and he had no zip-up windbreaker nor travel bag when dropped off at Dave's apartment between 9:15 a.m. and 9:20 a.m. Mr. Ayo was wearing a white dress shirt and pants, and requested I drop him off at work after changing clothes, but I had an appointment and could not wait."
> (R. 313-315).

Next, Defense Counsel's undue delay to investigate and secure alibi witness "Dave," who Mr. Ayo didn't know last name, but provided detailed map to his front door. Ultimately resulted in irreparable harm, with Defense Counsel losing the "primary" alibi witness. (R. 173-174; Exhibit – D).

"Dave" would have additionally offered exculpatory testimonial evidence, directly contradicting the State's chief witness, who [mis]identified Mr. Ayo as the perpetrator. Dave would have testified that:

> "Theo Brickley dropped Mr. Ayo off at his apartment between 9:15 a.m. And 9:20 a.m. Then Mr. Ayo called a cab from his home and was there changing into work clothes until the cab arrived at 9:28 a.m. That he [Dave] gave Mr. Ayo a broken knife to strip copper wire and sold him a travel bag(s) and dark blue weatherproof zip-up windbreaker before leaving in cab."
> (R. 316-318).

Appellant contends, the zip-up windbreaker and work knife were (two (2) of the only three (3) pieces of tangible evidence) introduced by the State in trial. The last piece of alleged evidence, the $21.00 of U.S. Currency, was undoubtedly justified by Mr. Ayo's job and the $300.00 Western Union Receipt from less than 24 hours before the crime against Mr. DeBroy. (R. 316-319; Defense Exhibit – 1). Moreover, the fact officials placed so much emphasis on Mr. DeBroy's initial description of the perpetrator wearing a blue or black (pullover) cotton sweatshirt, that the deputies labeled Mr. Ayo's green Tee-shirt as that of:

> "Green (pullover) shirt."
> (See Exhibit – C).

The admission of this alleged evidence was extremely prejudicial, absent the exculpatory testimonial evidence of both ready and available alibi witness[es].

Defense Counsel simply did not call "any" Defense witnesses, both of which would have provided exculpatory testimonial evidence, undermined confidence in the outcome of Mr. Ayo's trial. Harrison v. Quarterman, 496 F3d 419, 427-428 (5ᵗʰ Cir. 2007); Nealy v. Cabana, 764 F.2d 1173, 1180 (5ᵗʰ Cir. 1985) (prejudice component satisfied where missing testimony directly contradicted the prosecution's evidence).

Thus, had Defense Counsel channeled his pretrial investigation of securing these two witnesses, the work knife and newly purchased zip-up windbreaker would have been suppressed, the State not carried erroneous burden of proof, and jury returned a not guilty verdict of innocent construction worker.  Undoubtedly satisfying the "unreasonable" performance and establishing the "prejudicial" prong(s) of Strickland, supra.

26.   *Improper evidence of other crimes.*[20]

### ASSIGNMENT OF ERROR NO. 9

Trial Court erred by failing to grant a mistrial when the State committed fundamental error and "perjury" by fraudulently informing jury that Mr. Ayo is wanted for a parole violation, when Mr. Ayo has (never) been on parole, violating his Sixth and Fourteenth Amendment Constitutional Right(s).

### ARGUMENT IN SUPPORT

When counsel first called for a mistrial, testimony of other crimes testimony was introduced when nothing in the present charges even suggested that Mr. Ayo may have been wanted in another jurisdiction.

The State repeatedly accused Mr. Ayo of being wanted for a parole violation in Santa Rosa County, Florida.  (R. 330-333).  Public record will conclusively demonstrate that  Mr. Ayo has (never), never been on parole in any state, let alone wanted for a parole violation.  See e.g., State v. Jackson, 625 So 2d 146, 149 (La. 1993), for the evidence to be admissible, the State "must" prove with clear and convincing evidence that the other acts or crimes occurred and were committed by Mr. Ayo, and demonstrate that the other acts satisfy one of the requirements listed in La C.E. Art. 404(B)(1).  The State did not meet that burden of proof in bench conferences or trial.  (R. 330-333).

Assuming arguendo, any parole violation would have had nothing to do with the

20. Assignment of Error No. Two of Appellate Counsel's initial brief.

33

case at bar and a mistrial should have been declared because; (1) there was no element for which Prieur evidence was genuinely at issue in the case; (2) no clear and convincing standard was used to test whether it had any valid evidentiary value; and (3) the probative value of the evidence was certainly outweighed by its prejudicial impact.

The requirements of State v. Prieur, 277 So.2d 126, 128 (La. 1973), are Mr. Ayo's constitutional safeguards against the introduction of irrelevant and prejudicial information. Certainly without certified court documents this allegation was strictly "out of bounds" for the trial at bar and was offered for no other reasons than to reinforce the image that Mr. Ayo was a wanted criminal.

The prosecutor intentionally introduced this perjurous information for its prejudicial effect. Thus, the vague admonishment to *"strike the question and response"* did not cure the fundamentally unfair trial Mr. Ayo received, and mistrial should have been granted. (R. 329-333).

### 27. Trial transcripts "altered" to conceal perjured testimony and ineffective assistance of counsel.

Appellant motioned this Court for an "in-camera" inspection of trial tape(s) October 12, 2008, because hidden within the (original) recorded copy of trial proceedings to-wit: within the State's cross-examination of Mr. Ayo. (R. 329-365). The Assistant District Attorney, Shannon Swaim questioned Mr. Ayo of an erroneous non-existing parole violation. Actually, she did not question, but merely instructed the jury *"He is a liar"* on at least three (3) occasion(s). In fact, an outright (unethical shouting match) in jury's presence has been *omitted* from the record.

Mr. Ayo reasonably contends, the transcript has been modified as follows:

| Original Trial: | As Depicted in Transcripts: |
|---|---|
| Q. So you were sentenced in 1994 to 17 years and now 13 years later you're not on parole? | Q. You're not on parole? |
| A. No, Ma'am. | A. No, Ma'am. |
| Q. He's a liar. | Q. At this time. (Altered) |
| A. I'm not lying. | A. At this time. (Altered) (emphasis added) |

34

Ms. Swaim:
    He's a liar.                             (Omitted)
    He's a liar.                             (Omitted)

Defendant:
    You want to talk about liars. Let's talk about    (Omitted)
    your lying ass officers who conveniently
    said everything was in plain view.

Mr. Schmidt:
    Objection, Your Honor.                  (Omitted)

(See Between R. 329-365; See also In-Camera Motion).

Logically, in light of the fact Mr. Ayo has "never," never been on parole in any state, Mr. Ayo certainly would not state that:

> "No, ma'am. [I'm not on parole] at this time."
> (R. 330)

The current record fraudulently depicts Mr. Ayo erroneously endorsing Ms. Swaim's perjurous and slanderous accusation of other crimes evidence. State v. Constantine, 364 So.2d 1011, 1014 (La. 1978). Nevertheless, the evidence introduced by the State exceeded the permissible scope of cross-examination or rebuttal evidence in that it was not relevant to the issue raised by Mr. Ayo during his testimony on direct examination. See e.g., Nero v. Blackburn, 597 F.2d 991, 993-994 (5th Cir. 1979) (failure of defense counsel to request mistrial, when Louisiana law would have automatically granted one, constituted assistance of counsel constitutionally ineffective). Thus, constituting fundamental error affecting the fairness and integrity of entire trial proceedings, and trial judge should have at least sustained objection and admonished jury to rectify the material error. See e.g., In the Interest of Solomon, 672 So.2d 1039, 1043 (La.App. 4 Cir. 1996), any misstatements or irregularities, which omits a material part of trial is imputable to Mr. Ayo, and should be corrected even after the record has been transmitted to Appellate Court. La.C.C.P. Art. 2132; Guillie v. Dept. of Transp. and Dev., 538 So.2d 1144, 1146 (La.App. 5 Cir. 1989).

28. *Improper prosecutorial comments.*

Appellant contends the aforementioned prosecutorial misconduct demonstrates an

extremely prejudicial attack on Mr. Ayo, the credibility of the (only) Defense witness.
U.S. v. Herrera, 531 F.2d 788, 789-790 (5th Cir. 1976). Here it was impermissible for the
prosecutor to insist Mr. Ayo "is lying" and the jury should not believe his testimony,
attempting to impart verity to the testimony of the deputies by giving the jury her own
personal guarantee that the officers were telling the truth and Defendant is lying.  The
Fifth Circuit in U.S. v. Restrepo-Grunda, 575 F.2d 524, 529-530 (5th Cir. 1978),
concluded that a conviction obtained by such inflammatory rhetoric must be reversed
because the prosecutor's remark(s) rose to the level of "plain error." United States v.
Young, 470 U.S. 1, 14, 105 S.Ct. 1038, 1066, 84 L.Ed.2d 1 (1985).

29.     *Improper Impeachment of "unavailable" witness.*[21]

30.     *Prosecutorial misconduct of numerous inflammatory remarks.*

        The second time Defense moved for mistrial was when the prosecutor would not
cease her highly prejudicial "dialogue," not even over objection:

        Ms. Swaim:
Q.      Now, you do know that [Mr. Ayo's] good bud: Theo Brickley -

        Mr. Schmidt:
        Objection, Your Honor.

        Ms. Swaim:
        Just got guilty for like four (4) felonies in Division "O."

        Mr. Schmidt:
        Objection, Your Honor.  May we approach.

The Trial Court ruled that Ms. Swaim did not have the right to go into Mr. Brickley's
criminal history, but that a mistrial would not be granted.  Then upon Defense request, the
Judge "*refused*" to admonish the jury. (R. 335-339).

        Appellant contends, Theo Brickley was not even present to testify when the State
improperly tried to impeach his credibility through highly inflammatory remark(s) -
certainly not question(s) put to Mr. Ayo.  If Mr. Brickley had testified, then his
convictions would have been fair game.  However, the references to these conviction(s)
were clearly designed to make Mr. Ayo guilty by association, as no evidence was

_____
21 Legal issue(s) 30 and 31 have been consolidated into one argument for convenience of Court(s).

presented that Mr. Ayo knew of the charges, much less any convictions.

The Fourth Circuit addressed an identical situation in State v. Barber, 617 So.2d 974, 976 (La.App. 4 Cir. 1993), the prosecutor's line of questioning, including statement that defendant's sister was in business of selling drugs, was severely prejudicial and completely irrelevant as statement was outside of any evidence adduced at trial. Thus, questioning was impermissible and trial court should have at least admonished the jury to disregard prosecutor's statement. Id.; La.C.E. Art. 403; La.C.Cr.P. Arts. 770 & 771. Distinguishably different, State v. Walker, 836 So.2d 618, 623-624 (La.App. 5 Cir. 2002) (An admonition to the jury was sufficient to rectify any adverse affects by State's comment(s))

Review of the record shows that Mr. Ayo was the (only) Defense witness to testify. The State's *repeated* inflammatory remarks of calling Mr. Ayo "a liar" in jury's presence, coupled with ridiculing his inability to subpoena Mr. Brickley, and then further improperly attacking the character and credibility of an unavailable witnesses was so prejudicial. Absent admonishment of jury, the *"cumulative"* amount of improprieties undoubtedly affected Mr. Ayo's substantial due process right(s) of receiving a fair and and impartial trial, and a mistrial should have been declared. U.S. v. Garza, 608 F.2d 659, 665 (5th Cir. 1978).

### 31.  Abuse of judicial discretion refusing to admonish jury.

The Court's do not indicate that only the prosecuting attorney is worthy of blame. U.S. v. Corona, 551 F.2d 1386, 1391 n. 5 (5th Cir. 1977). Indeed the Trial Judge had an obligation in the interest of fairness and justice to stop the prosecutor from delivering a greatly prejudicial argument sua sponte. But once such statements are made, the damage is hard to undo:

> "Otherwise stated, one cannot unring a bell; after the thrust of the saber, it is difficult to say forget the wound; and finally, if you throw a skunk into a jury box, you can't instruct the jury not to smell it."

Dunn v. U.S., 307 F.2d 833, 886 (5th Cir. 1962).

Nevertheless, when the Trial Court refused to admonish the jury and left numerous

prejudicial "remarks" go uncorrected, a mistrial should have been granted. Barber, supra.

Thus, the reversal of this fundamentally unfair trial and unjust conviction of innocent

construction worker is warranted.

32.    *Improper impeachment of Mr. Ayo's credibility.*

Mr. Ayo testified that he was previously convicted of manslaughter in 1994, which

is accidental death/culpable negligence under Florida law. The State objected, and Trial

Court "improperly" sustained, precluding Defense line of questioning going to the

credibility of (only) Defense witness. With the State thereafter, capitalizing that it wasn't

accidental but murder. (R. 328-330).

Mr. Ayo contends, Florida statutory law is clear, as well as it was made part of Mr.

Ayo's 1994 *contracted* plea agreement.

> "State: manslaughter is (not) enumerated as murder, Your Honor. So Mr.
> Ayo will be receiving good time with this sentence."
> (See Florida Plea and Sentencing Transcripts)

This fact is further demonstrated by the prosecutor's bewilderment and perjurous

remarks:

> "So you were sentenced in 1994 to 17 years, and now just 13 years later
> you're not on parole [No, ma'am]. . . He's a liar. He is a liar He has a
> detainer for violating parole in Santa Rosa County, Florida."
> (R. 330)[22]

Public record corroborate that Mr. Ayo is not, and has (never) been on parole in any state,

nor has he suffered a murder conviction.

First, the trial court erred by excluding such evidence that manslaughter was not

enumerated as murder under Florida law, violating substantial constitutional due process

right(s) of Defendant. State v. Everidge, 702 So.2d 680, 684 (La. 1997). Next, after Mr.

Ayo stipulated to the conviction of the previous offense, the issues relating to it were

foreclosed in this prosecution. Consequently, the testimony concerning specifics

surrounding his prior conviction (non-existent parole violation) was nothing less than

irrelevant inflammatory question(s) and remarks put to the Defendant. See, State v.

---

[22] Note: Multiple Bill proceedings were dismissed by State to avoid developing record that Mr. Ayo has "never" been on parole and testified truthfully. (R. 410). See also Assignment of Error No. 6, improper evidence of other crimes.

Pounds, 359 So.2d 150, 153 (La. 1978).   Thus, the Trial Court committed fundamental error "sustaining" objection, leaving jury to weigh Mr. Ayo's credibility with the erroneous assumption of Mr. Ayo having a prior murder conviction as opposed to manslaughter by mere negligence.

33.   *Prosecutorial misconduct and abuse of judicial discretion by allowing state to breach stipulation during trial.*

### ASSIGNMENT OF ERROR NO. 10

Trial Court committed fundamental error by admitting evidence agreed upon by State in pretrial not to introduce, violating Mr. Ayo's Sixth and Fourteenth Amendment Constitutional Right(s) to a fair trial.

### ARGUMENT IN SUPPORT

The State disclosed a letter to the Defense that Mr. Ayo wrote to William Barrett, the cab driver in the instant case.  However, the State agreed pretrial not to introduce the impeachment evidence.  When the State breached that agreement, Defense Counsel objected, arguing the Defense would have elected a different trial strategy and Motion in Limine.  State v. Fabacher, 362 So.2d 555, 558 (La. 1978).  Nevertheless, the Trial Court admitted (State's Exhibit – 21; R. 345-349).

Appellant contends, the State's stipulation not to introduce Mr. Ayo's letter into evidence has the effect of a judicial admission which binds all parties and the court to the terms actually agreed upon.  Rice v. Glad Hands, Inc., 750 F.2d 434, 438 (5th Cir. 1985); R.J. D'Hemecourt Petroleum Inc. v. McNamara, 444 So.2d 600, 601 (La. 1983).  And generally stipulations entered into freely and fairly are not to be set aside except to *"prevent manifest injustice,"* so as to warrant granting of motion to modify stipulation. Chatzicharalambus v. Petit, 430 F.Supp. 1087, 1090 (E.D. La. 1977).

In the case sub judice, the District Attorney did not motion to modify stipulation nor reserve the right to impeach Mr. Ayo with the letter if Defendant took the stand.  State v. Fallon, 290 So.2d 273, 283 (La. 1974).  The State just breached the pretrial agreement, introducing the letter which made mention of Mr. Ayo's incarceration, posting bond I another state, and knife as defense weapon following recent assault, in which the State utilized to prejudicially twist into robbery weapon.  (R. 345-349).

Mr. Ayo contends the Defense cannot be robbed of the fair and legitimate moral force of its case merely because the State decides to breach the stipulation mid trial. State v. DeHart, 445 So.2d 419, 421 (La. 1984); La.C.CY.P. Art. 921 (2006). Thus, the Trial Court ruling concerning the [un]timely admission of material evidence must be reversed and remanded for a new trial to be held, as the prejudicial effect of latter clearly outweighs its probative value.

34.   *Cumulative error(s) not harmless.*[23]

## ASSIGNMENT OF ERROR NO. 11

Trial Court erred in not intervening and properly govern proceedings, stopping State's repeated improprieties denying Mr. Ayo's right to a fair and impartial trial, violating his Sixth and Fourteenth Amendment Constitutional Right(s).

## ARGUMENT IN SUPPORT

Mr. Ayo contends, he need not methodically reiterate the preceding thirty-three (33) error(s) that so prejudice the entire trial, that the resulting conviction violated due process. Derden v. McNeel, 978 F.2d 1453, 1454 (5th Cir. 1992), relief may only be granted for cumulative errors in the conduct of a state trial where:

1.   The individual errors involve matters of constitutional dimension;

2.   The error(s) are not procedurally barred; and

3.   The error(s) so infected the entire trial, that the resulting conviction violates due process.

Mr. Ayo contends, in satisfying the First prong of test: With the cumulative effect of so many error(s) surpassing the harmless error test of Chapman v. California, 386 U.S. 18, 25-26, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). It would be nothing less than a waste of judicial resources to engage in such an argument, that thirty-three (33) errors were harmless and Mr. Ayo received his Sixth and Fourteenth Amendment Constitutional due process right(s) and equal protection of the law to a fair trial.

In satisfying the Second prong of test: Mr. Ayo is merely on direct appeal and certainly not procedurally barred from review.

In satisfying the Third prong of test: The introduction of illegally seized evidence,

23 Ground Twenty-two of pro se Writ of Habeas Corpus  (Supp. R. 17-61; R. 16, 151-146).

49

out of jurisdiction and absent a warrant. Further, the cumulative amount of prosecutorial misconduct, absent admonishment of jury, undoubtedly infected the entire trial. Additionally, obvious pretrial ineffective assistance of defense counsel not investigating and losing "exculpatory" alibi witness[es], undoubtedly resulting in a fundamental miscarriage of justice and the unconstitutional conviction of an innocent construction worker on his way to work.

Thus, unequivocally satisfying the three-prong standard set forth in Darden, supra, and a new unbiased and impartial trial must be held.

## CONCLUSION

WHEREFORE, Mr. Ayo respectfully moves this Honorable Court to grant relief as follows:

1.    Find the investigatory stop out of jurisdiction (certainly not a hot pursuit), and arrest on much less than reasonable cause "illegal" issue Writ, discharging Mr. Ayo;

2.    Or, in the alternative, find the investigatory stop and arrest "illegal," order "all" evidence seized, to-wit: work knife, U.S. Currency, windbreaker, and suggestive one-on-one show-up identification suppressed;

3.    Reverse the judgment and sentence, remanding for a new trial within 120 days of this order.

RESPECTFULLY SUBMITTED,

GLENN CHARLES AYO

## AFFIDAVIT / CERTIFICATION

I, Glenn Charles Ayo, hereby declare under penalty of perjury that I read the foregoing Initial Brief of Appellant and the facts herein are all true and correct and complete to the best of my knowledge and belief. I, Glenn Charles Ayo, hereby certify that a true copy of the foregoing has been furnished by prepaid U.S. Postal to the District Attorney's Office, 200 Derbigny St., Gretna, LA 70053.

Mailed this ____30^TH____ day of October, 2008.

Glenn Charles Ayo #533823
Main Prison
Louisiana State Penitentiary
Angola, LA 70712

42

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

---

**NO. 08-KA-1179**
**CONSOLIDATED WITH 08-KA-468**

---

STATE OF LOUISIANA,
                                        APPELLEE

VERSUS

GLENN C. AYO
                                        APPELLANT

---

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 07-369, DIVISION "M",
THE HONORABLE HENRY G. SULLIVAN, JR., JUDGE PRESIDING.

---

SUPPLEMENTAL BRIEF OF THE STATE OF LOUISIANA, APPELLEE

---

PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
24th JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA

TERRY M. BOUDREAUX # 3306
ANNE WALLIS # 15063
(APPELLATE COUNSEL)

SHANNON SWAIM
(TRIAL COUNSEL)
ASSISTANT DISTRICT ATTORNEYS
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................... iii

STATEMENT OF THE CASE ................................................ 1

STATEMENT OF THE FACTS .............................................. 2

ASSIGNMENT OF ERROR ................................................. 2

LAW AND ARGUMENT ..................................................... 4

CONCLUSION ................................................................ 16

CERTIFICATE OF SERVICE ............................................... 17

## *TABLE OF AUTHORITIES*

### CASE LAW

*State v. Hurd*, 05-258 (La.App. 5 Cir. 11/29/05), 917 So.2d 567 . . . . . . . . . . . 8

*State v. Truitt*, 500 So.2d 355 (La.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). 9

*State v. Ratcliff*, 416 So.2d 528, 531 (La.1982) . . . . . . . . . . . . . . . . . . . . . . . 9

*See State v. Wright*, 598 So.2d 493 (La.App. 2d Cir.1992). . . . . . . . . . . . . . 9

*State v. Myers*, 583 So.2d 67 (La.App. 2d Cir.) . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Butler*, 01-907 (La.App. 5 Cir. 2/13/02), 812 So.2d 120, 124. . . . . . . 11

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) . . . . . . . . . . . 12

*State v. Belton*, 441 So.2d 1195 (La.1983), *cert. denied*, 466 U.S. 953, 104 S.Ct.
2158, 80 L.Ed.2d 543 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*State v. Square* 257 La. 743, 785, 244 So.2d 200, 215 (LA 1971) . . . . . . . . . 13

*State v. Gibson*, 391 So.2d 421 (La.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). . . . 14

*State v. Castleberry*, 98-1388,(La.4/13/99); 758 So.2d 749, 776, *cert. denied*, 528
U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999) . . . . . . . . . . . . . . . . . . . . . 16

### STATUTORY LAW

LSA-R.S. 14:64 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

NO. 08-KA-0468

STATE OF LOUISIANA,
                                                    APPELLEE

VERSUS,

GLENN C. AYO, APPELLANT

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 07-369, DIVISION "M",
THE HONORABLE HENRY C. SULLIVAN, JR., JUDGE PRESIDING.

## SUPPLEMENTAL BRIEF OF THE STATE OF LOUISIANA, APPELLEE

### *STATEMENT OF THE CASE*

On January 19, 2007, the defendant was charged by bill of information with

one count of armed robbery, while armed with a dangerous weapon, to wit, a knife,

a violation of LSA-R.S. 14:64. (Vol. 1, p. 23). Trial was held on November 27, 2007,

and the following day, the defendant was found guilty as charged in a one hour

verdict. (Vol. 1, p. 18-20, 57). A motion for new trial was heard and denied. (Vol. 1,

p. 59, 60-67). The defendant was subsequently sentenced to 87 years at hard labor,

without benefits. (Vol. 1, p. 59). A multiple bill was filed and subsequently dismissed

by the state. (Vol. 1,p. 68). A motion for appeal was filed on December 17, 2007.

(Vol. 1.p. 70).

On June 25, 2008, the defendant filed an appeal. He raised two issues each with

several sub-parts. He assigned the following: **(1)** the trial court erred by failing to suppress the identification of the defendant because the evidence of identification was **(a)** insufficient and the **(b)** identification procedure was suggestive, and **©)** the defendant's arrest was illegal because no warrant was issued and **(d)** there was no probable cause for the arrest and **(e)** the officers who arrested the defendant had no jurisdictional authority to arrest him; and **(2)** A mistrial should have been granted based on the **(a)** introduction of other crimes evidence and based on the **(b)** state asking the defendant on cross examination about the conviction record of a defense witness who failed to show for trial. The state answered the appeal on August 5, 2008. The defendant subsequently requested and was granted permission to file a supplemental brief. The state now answers those supplemental claims.

### STATEMENT OF THE FACTS

The state adopts its recitation of facts as outlined in its answer to the defendant's original appeal.

### SUPPLEMENTAL ASSIGNMENTS OF ERROR

The Appellant asserts the following thirty five (35) assignments of error:

**(1)** The investigatory stop in Orleans Parish was without reasonable suspicion or probable cause and therefore violated the Fourth Amendment.

**(2)** Officers were not in hot pursuit of defendant therefore they were without jurisdiction to arrest defendant in Orleans Parish

**(3)** Denial of due process to cross examine State's witness on material issues

**(4)** Officers acting as private citizens had no authority to arrest defendant outside of the officers jurisdiction;

**(5)** The stop was based on race/gender and therefore was illegal.

**(6)** Lack of a particularized and objective basis for suspecting defendant of

2

having committed a crime.

(7) Abuse of judicial discretion by allowing use of perjured "fraudulent probable cause."

(8) Abuse of judicial discretion by allowing use of perjury of "fraudulent perpetrator."

(9) Abuse of judicial discretion by allowing use of perjured in court identification.

(10) Ineffective assistance of counsel.

(11) Trial court erred in failing to suppress the seizure of defendant.

(12) There was not enough information nor probable cause for defendant's arrest.

(13) The trial court erred in failing to suppress the evidence.

(14) The state failed to carry its burden of proving that the currency seized derived from the robbery in question.

(15) Illegal stop therefore the abandoned money could not be legally seized.

(16) Recovery of the money from defendant's pocket exceeded a Terry pat down.

(17) The illegal stop and search of the defendant did not ripen into probable cause for arrest.

(18) The state failed to establish the identity of the money through a proper chain of custody.

(19) Trial court erred in failing to suppress defendant's zip up windbreaker.

(20) Illegal exploratory search.

(21) Trial court error in admitting the windbreaker because it was not in plain view.

3

(22) Suggestive out of court identification.

(23) Suggestive in court identification.

(24) Material fraud of in court identification

(25) Unlawful booking

(26) Ineffective assistance of counsel

(27) Improper evidence of other crimes

(28) Altered trial transcripts

(29) Improper prosecutorial comments.

(30) Improper impeachment of unavailable witness

(31) Prosecutorial misconduct because of numerous inflammatory remarks.

(32) Abuse of judicial discretion in refusing to admonish the jury.

(33) Improper impeachment of defendant's credibility.

(34) Prosecutorial misconduct and abuse of judicial discretion by allowing

state to breach stipulation made during trial

(35) Cumulative error

### *ARGUMENT*

Before addressing the defendant's claims, the state notes that in his original

appeal, the defendant contested the stop as illegal and his arrest as lacking in probable

cause. The defendant also contested the jurisdiction of the Jefferson Parish officers

to pursue him and arrest him in New Orleans. In addition, he contested the

identification as suggestive and legally insufficient. Several of the instant claims are

repeat of the original claims presented on appeal.

Claim one in the instant supplemental petition, along with claim two, claim

four, claim six, claim 11, claim 12, claim 22, claim 27,and claim 33, should be

dismissed as these claims were already brought up on original appeal and the state has

4

answered all of these claims. Claim 30 should be dismissed for complete failure of the defendant to brief.[1] The state now addresses the 25 claims in the supplemental brief that have not yet been brought to this Court in the original appeal. Specifically the state now addresses claim three, five, seven, eight, nine, ten, 13, 14, 16, 18, 19, 20, 21, 23, 24, 25, 26, 28, 29, 31, 32, 34, and 35.

## *CLAIM THREE*

### *Trial court error in precluding the defendant from cross-examining arresting officer on relevant material*

The defendant complains that the trial court precluded him from cross examining officer Simoneaux at the motion hearing. Specifically he states that the trial court precluded him from questioning the officer about the "lawfulness of his jurisdiction" and about his "lawful authority to conduct investigations in Orleans Parish." The transcript clearly shows otherwise. Not only was Deputy Simoneaux cross examined by the defense counsel but at no time was the cross examination restricted by the trial court. (Vol. 1, p. 107-110). This claim has no merit.

## *CLAIM FIVE*

### *Lawfulness of stop based soley on race or gender*

The defendant alleges that he was stopped based on his race and/or gender and therefore the evidence should be suppressed. The record shows otherwise. The defendant was stopped because he met the description given by the victim. He was also stopped because the victim was robbed by use of a knife and the defendant was seen with a knife protruding from his pocket.(Vol. 1, p. 158, 162-164). The record does not show that the defendant was stopped because of his race or his gender, but

---

[1] Although he presents two different claims, the defendant repeats the number 21 twice. Thus, claim 21 on page 27 of the supplemental brief should read claim 22, and so on.

5

was instead stopped because he was seen within two blocks of the robbery, matching

the description given, with a knife in his pocket. (Vol. 1, p. 162, 169-170, 182). This

claim has no merit.

## CLAIM SEVEN/ CLAIM EIGHT

### *Abuse of judicial discretion in allowing use of perjured testimony*

In *claim seven* the defendant alleges that Deputy Simoneaux's testimony

materially differed from Detective Jewell's testimony and that as a result, Deputy

Simoneaux's testimony was perjured and the state knew it was perjured. In particular,

he states that Deputy Simoneaux testified falsely that Detective Jewell actually saw

the defendant enter a taxi when in fact Officer Jewel never saw the defendant enter

a taxi.

Officer Jewel testified that when he returned to where he had originally seen

the defendant, that the defendant was no longer there. However, he asked a person

who was in the area if he "had seen where the guy that was just standing there with

the green shirt" went. (Vol. 1, p. 163). The person responded that the defendant had

just "got into a blue cab" and headed towards New Orleans. Officer Jewel then "put

it out" to Deputy Simoneaux that "I think I might have seen the guy...or I saw the

guy...and he got into a blue cab, and he should be heading toward the city." (Vol. 1, p.

163-164). Officer Simoneaux testified that Officer Jewell broadcast that he "observed

a suspect fitting the perpetrator's description getting into a cab." (Vol. 1, p. 236).

However, he also testified that he was not certain if Officer Jewell actually saw the

defendant enter the taxi or not. (Vol. 2, p. 254).

There is no indication in the record that either Officer Simoneaux or Officer

Jewell's testimony was perjured or that the state used perjured testimony. Rather, in

the heat of the moment of trying to catch an armed robber who was likely still armed,

Officer Jewell apparently gave officer Simoneaux brief information that the perpetrator had just entered a taxi. Even if officer Simoneaux believed that Officer Jewell had witness the defendant entering the taxi, that does not mean that any testimony was perjured or intentionally false. This claim has no merit.

With regard to *claim eight*, the defendant alleges that Detective Jewell's testimony was perjured. Specifically, he alleges that although officer Jewell testified that he informed "911" that the defendant had a knife in his pocket, that in fact, he never told "911" any such thing. He alleges that at the time 911 was called by the victim, that Officer Jewell had not yet even seen nor spotted the defendant.

The defendant is apparently confusing the 911 call made by the victim with the dispatch call made by officer Jewell. In the dispatch made by officer Jewell, he informed the dispatcher that he saw the defendant with a knife in his pocket. The dispatch call was different from the 911 call made by the victim. (Vol. 1, p. 186-187).This claim has no merit.

### CLAIM NINE/CLAIM TWENTY-THREE/CLAIM TWENTY FOUR
### *Use of perjured in court in court identification/Suggestive in court*
### *identification/Material fraud of in court identification*

In his original appeal, the defendant assigned as error that the victim's identification of him was suggestive. He alleged that the identification was suggestive because at the time of the victim's identification, the victim knew that the defendant had been stopped as a suspect and that tainted the victim's subsequent identification of the defendant. The defendant alleges now that the victim's in court identification of the defendant at trial was perjured and suggestive. Specifically , he asserts that before trial the victim was shown a photo of the defendant and that this pre-trial identification of the defendant tainted the later identification in court. He also alleges

that although the victim could not identify the defendant at motions, he was able to identify the defendant at trial because the state had the defendant strategically located at the "jail door" to make for an unmistakably positive identification.

When challenging an identification procedure, the defendant must prove the identification was suggestive and that there was a substantial likelihood of misidentification. It is the likelihood of misidentification that violates due process, not the mere existence of suggestiveness. *State v. Hurd*, 05-258 (La.App. 5 Cir. 11/29/05), 917 So.2d 567, 570, *writ denied*, 06-1128 (La.11/17/06), 942 So.2d 530.

The defendant alleges that the victim could not identify him until the victim was first shown a booking photo of the defendant and that the viewing of the photo tainted the later identification. However, the record shows that the victim identified the defendant long before the victim ever viewed a booking photo. The victim first viewed the defendant's booking photo at trial, after he had already identified the defendant at the gas station where the defendant was arrested .(Vol. 1, p. 79-97, 177; Vol. 2, p. 279).

As for the defendant being strategically placed at the "jail door" for easier identification purposes, there is nothing in the record to indicate this. The state has read the pages in the record that the defendant cites to in support of his claim, including a review of the pages before and after the pages cited by the defendant, but has found nothing which supports the allegation. This claim has no merit.

## CLAIM TEN/CLAIM TWENTY-SIX

## INEFFECTIVE ASSISTANCE OF COUNSEL

In *claim ten* the defendant alleges his counsel was ineffective in allowing into evidence the knife, currency, and zip up weather windbreaker, all of which was confiscated from the defendant upon his arrest. In *claim twenty-six*, the defendant

alleges that his counsel was ineffective in failing to locate certain witnesses.

The Louisiana Supreme Court has held that the appropriate avenue for asserting a claim of ineffective assistance of counsel is through post-conviction relief, rather than by direct appeal. *State v. Truitt,* 500 So.2d 355 (La. 1987). Therefore, these ineffective assistance claims should be dismissed because it is more properly heard on a post conviction application rather than in an appeal. Should this Court disagree, the claims have no merit.

In order to show ineffective assistance of counsel, the defendant must show that (1) his counsel's performance was deficient, and (2) the deficiency prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show prejudice, the defendant must demonstrate that, but for the unprofessional conduct, the outcome of the proceedings would have been different. Therefore, the defendant must show a reasonable probability that counsel's error so undermined the proper functioning of the adversarial process that the trial court cannot be relied upon as having produced a just result. Effective counsel has been defined to mean "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." *State v. Ratcliff,* 416 So.2d 528, 531 (La. 1982). Only if defendant has shown both error and prejudice will his conviction be found unreliable and set aside. *See State v. Wright,* 598 So.2d 493 (La.App. 2d Cir. 1992). There is a strong presumption that the conduct of counsel falls within the wide range of responsible professional assistance. *State v. Myers,* 583 So.2d 67 (La.App. 2d Cir.), *writ denied,* 585 So.2d 576 (La. 1991).

With regard to **claim ten**, that counsel was ineffective in allowing incriminating evidence to be introduced, this is not the case. The defense attorney challenged the evidence by filing a motion to suppress the evidence. (Vol. 1, p. 9). A

hearing was held and at the hearing, the defense counsel conducted a full cross examination of state witnesses. (Vol. 1, p. 80-124). After the motion hearing, defense counsel also gave oral argument as to why the evidence should be suppressed. (Vol. 1, p. 124-125). After the trial court denied the motion, defense counsel lodged an objection to the court's ruling. (Vol. 1, p. 127). Given that counsel did all that he could do to prevent the evidence from coming into play, it cannot be said that counsel was ineffective.

In reference to **claim twenty-six**, that counsel was ineffective in failing to call certain witnesses, including Theo Brickly, the record does not support the allegation. Defense counsel noted on the record that he attempted to serve Theo Brickley for trial but was unsuccessful. (Vol. 2, p. 336, 339). The defense had an instanter subpoena issued for this witness but there was no return on the subpoena. More importantly, defense counsel informed the defendant at trial that he was entitled to a continuance should Brickley not be available for trial. The defendant on the record informed the court that he did not want a continuance but wanted to proceed to trial even without the witness.(Vol. 1, p. 68-72).

In addition, the record shows that Theo Brickley also had four prior felony convictions. (Vol. 2, p. 335). When the state brought this information to the court, defense counsel objected. Hence, it cannot be said that counsel was ineffective for doing exactly what his client asked him to do. That is, to proceed t trial without a defense witness who had four prior felony convictions. Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. Where the only evidence of a missing witness's testimony is from the defendant , this Court views claims of ineffective assistance with great caution.

*State v. Perkins* 539 So.2d 100, 103 (La. App. 5 Cir.,1989). This claim should be dismissed.

## CLAIM THIRTEEN, FOURTEEN, FIFTEEN, SIXTEEN, SEVENTEEN, NINETEEN, TWENTY, AND TWENTY-ONE

In *claim thirteen* the defendant alleges that the knife should have been suppressed because the stop of defendant was illegal. In claim *fourteen and fifteen* he alleges that the money should have been suppressed for the same reasons. In *claim sixteen* he alleges that the search of his person was illegal, thus money confiscated from that search should be suppressed. In *claim seventeen*, he alleges that the stop was illegal and therefore the currency confiscated from the stop, being not immediately apparent, should have been suppressed. In *claim nineteen*, he alleges that the clothing confiscated was not in plain view and should have been suppressed. In *claim twenty* he alleges that all evidence should be suppressed because the evidence was confiscated by officers acting outside their jurisdiction. In *claim twenty one* he alleges that the jacket in question should have been suppressed because their was perjured testimony associated with its introduction.

In the original appeal, the defendant argued, as he does today, that his stop and arrest were both illegal. In his original appeal he also argued that officers had no right to arrest him outside of their jurisdictional authority The state has already addressed these claims in its answer to the original appeal. The state would only add that the trial court denied the motion to suppress evidence in this case. The trial court ruled that "based on the testimony of the three witnesses" he found the evidence to be legally seized. The trial court's denial of a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression. *State v. Butler*, 01-907 (La.App. 5 Cir. 2/13/02), 812 So.2d 120,

11

124.

The right of law enforcement officers to stop and interrogate one reasonably suspected of criminal activity is recognized by LSA-C.Cr.P. art. 215.1 as well as state and federal jurisprudence. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Belton*, 441 So.2d 1195 (La.1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). The right to make an investigatory stop and question the particular individual detained must be based on reasonable suspicion to believe that he has been, is, or is about to be engaged in criminal activity.

The preponderance of the evidence in this case did not favor suppression. As argued by the state in the original appeal, officers knew that a person meeting the description of the robber had just entered a taxi and they knew that the person who entered the taxi had a knife protruding from his back pocket. This alone was ample reason to stop the defendant because officers reasonably believed that defendant, who fit the description of the robber and who was carrying a knife that may have been the same knife used to rob the victim, may have just committed the crime. The trial court's ruling should be given deference. This claim also has no merit.

### CLAIM EIGHTEEN

### CHAIN OF CUSTODY

The defendant argues that the currency confiscated from him at the time of his arrest failed to meet the proper chain of custody. He first alleged this claim in a pro se "22 point" memorandum of law submitted to the trial court.(Vol. 1, supplemental, p. 22; vol. 1, p. 142-143). This issue went before the court and it was denied.(Vol. 1, p. 132, 141-145). In addition, the jury had no problem with the chain of custody in this matter when it elected to convict the defendant. Moreover, although the defense filed a motion to suppress, he failed to object at trial to the introduction of the money

and therefore the issue is waived. (Vol. 1,p. 222).

## CLAIM TWENTY FIVE

### *UNLAWFUL BOOKING IN PARISH OTHER THAN WHERE DEFENDANT*

### *WAS ARRESTED*

The defendant committed the instant offense in Jefferson Parish. He fled to Orleans Parish in a taxi that was pursued by Jefferson Parish officers. The taxi and the defendant were both located in Orleans Parish and the defendant was arrested in Orleans Parish by Jefferson Parish officers. The defendant claims that he was entitled to an extradition hearing to be held before he was transported to Jefferson Parish. The defendant brought a pre-trial motion to th court in a 22 points of law memorandum. In point 18, he alleged that under C. Cr. Pro. Art. 228, he should have been booked in Orleans Parish which is the parish he was arrested in. The trial court denied relief on that issue. Although he cites to C. Cr. Pro. Art. 228 today, his argument is that he should have had an extradition hearing. The argument today is different from the argument in the 22 points of law. Thus, because this issue was not brought up pre-trial nor was there ever an objection lodged to the alleged absence of an extradition hearing, the issue is waived.

In addition, the booking requirements under C. Cr. Pro. Art. 228 are administrative or ministerial functions, and failure to fulfill the duties imposed by these articles has no bearing upon the legality of an arrest. *State v. Square* 257 La. 743, 785, 244 So.2d 200, 215 (LA 1971)(reversed on other grounds).

### *CLAIM TWENTY-EIGHT/CLAIM TWENTY NINE*

### *ALTERED TRANSCRIPT AND PROSECUTORIAL MISCONDUCT*

In claim twenty-eight, the defendant alleges that the transcript of the trial is

13

altered. He also alleges in claim twenty-nine that the state made improper comments but he does not specify with clarity what comments he is referring to.

With regard to claim twenty eight, after a review of the pages that the defendant cites to, specifically pages 329-365 of Volume 2, the defendant's allegations reveal no inconsistencies, alteration, or editing on the face of the record. The defendant's complaints therefore, are unsubstantiated. With regard to claim twenty-nine, prosecutorial misconduct, he alleges misconduct with reference to the altered pages of the transcript. However, as stated, the state has searched the pages cited by the defendant and does not see any pages that may have been altered, but also fails to see any prosecutorial misconduct. This claim has no merit.

### CLAIM THIRTY ONE/CLAIM THIRTY TWO
### PROSECUTORIAL MISCONDUCT/ABUSE OF JUDICIAL DISCRETION IN REFUSING TO ADMONISH THE JURY

In his original appeal, the defendant alleged that the trial court erred in failing to grant a mistrial when the state asked the defendant about the conviction record of an unavailable defense witness. Today, the defendant alleges prosecutorial misconduct with regard to the state questions which were asked about the conviction record of the unavailable defense witness. He also alleges, that the trial court should have admonished the jury to disregard the state's questions.

The state answered this claim in claim two of the original appeal. The state would now add that it was harmless error for the state to question the conviction record of an absent defense witness. In *State v. Gibson*, 391 So.2d 421 (La.1981) the Supreme Court of Louisiana adopted the "harmless error" test first announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Application of that standard requires the reviewing court to focus on the erroneously

admitted evidence to determine whether there is a reasonable possibility that the error complained of contributed to the verdict obtained. The burden is on the prosecution to demonstrate that, beyond a reasonable doubt, the error did not contribute to the finding of guilt.

Here, the verdict was not attributable to any error other than the error made by the defendant to rob the victim. The overwhelming evidence in this case is what convicted the defendant, not the alleged conviction record of an unavailable defense witness. This claim has no merit.

## CLAIM THIRTY FOUR

### BREACH OF STIPULATION

The defendant alleges that the state and the defense both entered into a pre-trial agreement that certain letters written by the defendant would not be introduced into evidence. At trial and on cross examination, the state referenced a letter written by the defendant to a William Bartlett. The defense objected stating that it was agreed before trial that the letters would not be introduced to the jury. (Vol. 2, p. 344-348). The state answered that it had agreed not to bring the letter up in its case in chief, but since the defendant testified differently from what was in his letters, that it could impeach him on cross examination. The trial court allowed the state to cross examine with regard to the contents of the letters, noting that the defense had a copy of the letters pre-trial. (Vol. 2, p. 348).

In the letter in question the defendant wrote to a William Bartlett that he had a knife in his possession to avoid a "psychopathic contractor." (Vol. 2, p. 350). However, at trial the defendant stated he had the knife in his possession to use as a tool at work to cut copper. (Vol. 2, p. 316). Noting these inconsistencies, the state sought to impeach the defendant with the prior inconsistent statement. (Vol. 2, p. 350,

345-346). La. C.E. art. 801(C), La. C.E. art. 607(D)(2) permits the introduction of a prior inconsistent statement, even though it is hearsay, for the limited purpose of attacking the credibility of a witness. The purpose of impeachment is to diminish the credibility of a witness. When the testimony of a witness in court is inconsistent with a prior statement by the witness, the party calling the witness may be able to use the prior statement to impeach the witness, i.e., to diminish his or her credibility. Because the defendant was testifying differently from the contents of the letter with regard to why he had a knife in his possession, the contents of the letter was propr impeachment.

Moreover, it was harmless error to allow the introduction of the contents of the letter. The letters failed to contribute to the verdict because it was the overwhelming evidence that convicted the defendant, not the letters.

### CLAIM THIRTY-FIVE

### CUMULATIVE ERROR

Defendant claims the cumulation of errors at trial resulted in an unfair trial of Defendant in violation of the United States and Louisiana Constitutions. The errors complained of today are merit less and/or harmless. Thus, it cannot be said that the cumulative effect of erros lacking merit warrants reversal of a conviction or sentence. *State v. Castleberry*, 98-1388,(La.4/13/99); 758 So.2d 749, 776, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999).

### CONCLUSION

The State of Louisiana respectfully asks this Honorable Court to affirm the conviction and sentence of Glenn Ayo.

Respectfully submitted,

_____

Anne Wallis, #15063
Assistant District Attorney
200 Derbigny Street
Gretna, Louisiana 70053
(504) 368-1020

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served on all parties by

placing same in the United States mail, postage prepaid, this _____ day of

_____, 2009.                                     _____

Anne M. Wallis

17